**LAKEFIELD TELEPHONE COMPANY, Plaintiff,**

v.

**NORTHERN TELECOM, INCORPORATED, Defendant.**

No. 86–C–0619.

United States District Court, E.D. Wisconsin.

Sept. 28, 1988.

John W. Markson, Bell, Metzner, Gierhart & Moore, S.C., Madison, Wis., for plaintiff.

Terry E. Nilles, Robert E. Wrenn, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for defendant.

### DECISION AND ORDER

WARREN, Chief Judge.

This action arising under the Wisconsin Fair Dealership Law, Wis.Stat. § 135.01, et

---

seq., presents unique questions on the effects of a third-party agreement on an otherwise protected dealership. Plaintiff and defendant had an agreement whereby plaintiff would sell telephone "interconnect" systems for use by businesses. Plaintiff, in turn, had an "Exclusive Sales and Marketing Agency Agreement" with the third party, Telecom North, Inc., whereby plaintiff transferred to Telecom North plaintiff's entire right to sell defendant's product. Plaintiff brought suit when defendant terminated their agreement based on plaintiff's relationship with the third party. Clouding this picture, however, was the fact that while the upper management of defendant sought to terminate plaintiff's dealership because of the third-party agreement, other representatives of defendant, who worked directly with plaintiff, were aware of the third-party relationship and permitted its existence as a part of the agreement between plaintiff and defendant.

Based on the decision below, the Court finds that regardless of defendant's acquiescence to the plaintiff's third-party relationship, that relationship essentially destroyed the community of interest between plaintiff and defendant and removed plaintiff from the protection of the Wisconsin Fair Dealership Law.

## I. BACKGROUND

Plaintiff Lakefield Telephone Company brought suit in May 2, 1986, in Manitowoc County Circuit Court, against defendant Northern Telecom, Inc. (not to be confused with the third party mentioned above, Telecom North, Inc.). Plaintiff alleged violations of the Wisconsin Fair Dealership Law and sought both injunctive relief and monetary damages. Plaintiff claimed that defendant violated the dealership law on March 20, 1986, when defendant substantially changed the competitive circumstances of plaintiff's dealership and effectively terminated the dealership by restricting the territory in which plaintiff was authorized to do business; and on April 20, 1986, when defendant advised plaintiff that defendant would no longer continue to fill existing orders for plaintiff's customers. The case

was removed to this Court pursuant to 28 U.S.C. § 1446.

Plaintiff initially sought a temporary restraining order requiring defendant to continue to do business with plaintiff as a dealer of defendant's products. Because of the unavailability of this Court, the matter was handled by Judge Myron L. Gordon, who by a *Decision and Order* dated July 28, 1986, denied the request for a temporary restraining order. Plaintiff subsequently moved for a preliminary injunction, which was considered and granted by this Court in a *Decision and Order* dated February 18, 1987. *See* 656 F.Supp. 813 (E.D. Wis.1987).

On the day prior to the start of trial, the Court issued a further *Decision and Order*, requiring plaintiff to elect its remedy —injunctive relief or future damages—prior to trial. *See* 679 F.Supp. 881 (E.D.Wis. 1988). Past damages would still be a separate issue under either election, the Court said. *Id.* On the first day of trial, plaintiff chose injunctive relief, which prompted the question of whether a jury was appropriate. (Tr. at p. 2). After discussion with the parties, the Court stated that the ultimate question of whether a violation of the Fair Dealership Law had occurred was a matter of law to be decided by the Court. (Tr. at 7). However, the Court said since a jury panel had already been assembled for the case, a jury could be used in an advisory capacity on the factual issues underlying the ultimate question and in a binding capacity on the issue of past damages. (*Id.*) The Court also informed the parties that further discussion would not be foreclosed on the question of what issues would go to the jury. (Tr. at 7–8).

The case was tried over a period of two weeks. On February 17, the jury returned a Special Verdict containing the following questions and answers.

Question No. 1:

Was there an agreement entered into between Lakefield Telephone Company and Northern Telecom, Incorporated, wherein Lakefield was granted the right to sell Northern Telecom products?

Answer: Yes

Question No. 2:

At the time the parties entered into the agreement in Question No. 1, did the ultimate agreement permit the use of TNI (Telecom North, Inc.) by Lakefield?

Answer: Yes

Question No. 3:

Did Northern Telecom have good cause to terminate Lakefield?

Answer: No

Question No. 4:

What amount of money would compensate Lakefield for damages, if any, from:

a. the date of the termination through February 18, 1987?

[Answer:] $40,000

b. February 19, 1987, through December 31, 1987?

[Answer:] $20,000

Pursuant to a schedule established by the Court at the close of trial, the parties submitted the following motions, which were accompanied by extensive briefing. Plaintiff moved (1) for a determination that there was a community of interest between Lakefield Telephone Company and Northern Telecom, Inc. for purposes of § 135.02(1) & (3), Wis.Stats.; and (2) for judgment making the terms of the preliminary injunction permanent, awarding Lakefield Telephone Company the past damages determined by the jury, together with interest, and for the award of actual costs and attorneys fees pursuant to § 135.06, Wis. Stats. Defendant moved for a judgment of dismissal, or, in the alternative, a new trial. While those motions were under advisement, plaintiff filed two motions for a contempt citation, alleging that defendant had violated the preliminary injunction.

## II. TRIAL MOTIONS

### A. *Findings of Fact*

Pursuant to the Court's role in resolving plaintiff's prayer for equitable relief, the Court makes the following findings of fact.

1. Plaintiff Lakefield Telephone Company is a 75–year–old, five-employee, independent telephone company serving roughly a 75–mile square area of Manitowoc County.

Defendant Northern Telecom, Inc., a Delaware corporation with its principal place of business in Nashville, Tennessee, is engaged in the design and manufacture of telephone "interconnect" systems for use in businesses, including hotels, clinics, retail businesses, large offices, and the like.

2. An "inter-connect system" links a private branch exchange (called "PBX system") of a business with a telephone utility company. One type of PBX system manufactured and sold by defendant Northern Telecom was the SL–1.

3. In November of 1983, defendant Northern Telecom purchased a Milwaukee company called National Telecom. National Telecom had a branch office or business in Appleton, Wisconsin, called National Telecom North, Inc. National Telecom owned 80 percent of the stock of National Telecom North and one George Benson owned the other 20 percent. Benson's 20 percent interest was sold to defendant Northern Telecom when defendant purchased National Telecom.

4. Just prior to the sale, Benson incorporated Telecom North, Inc. (the third party referred to above). Just after the sale, in January of 1984, Benson hired all but two of National Telecom's Appleton employees. In April or May of 1984, Benson opened a Milwaukee office for Telecom North and staffed it, in part, with former employees of the Milwaukee office of National Telecom. Telecom North now has approximately 150 employees. The company recently merged with the Coradin Corporation, making it now one of the ten largest inter-connect companies in the country.

5. After initially forming his company, Benson made repeated overtures to defendant Northern Telecom in an attempt to have Telecom North become a dealership of defendant's SL–1 product. Defendant Northern Telecom rejected Benson's proposals and informed him that defendant did not intend to make him a distributor.

6. Thomas Nass worked for plaintiff Lakefield Telephone when he was a boy. At that time, Elroy Nass, the father of

Thomas, was a manager of Lakefield. At the times relevant to this suit, Elroy Nass served on Lakefield's board of directors.

7. In June of 1973, when Thomas Nass graduated from college with a bachelor's degree in electrical engineering, he was hired by National Telecom in Milwaukee. Thomas Nass worked for National Telecom, and later defendant Northern Telecom, until April of 1984.

8. During his work at National Telecom, Thomas Nass came to know George Benson and Roy Vande Hey, both of whom worked for National Telecom North and later Telecom North.

9. After National Telecom was bought by defendant Northern Telecom, Thomas Nass had discussions with Roy Vande Hey about the possibility of Lakefield becoming a distributor of defendant Northern Telecom. Thomas Nass thought a distributorship would be a good way for Lakefield to diversify and expand its market. Discussions also took place between Thomas Nass and his father, Elroy, as well as with Benson. Under the plan, Thomas Nass would quit his job with defendant Northern Telecom, return to Lakefield, and begin a Business Systems Division, which he would run.

10. In February of 1984, Lakefield began the process of applying for a dealership of defendant Northern Telecom products.

11. On March 19, 1984, Lakefield received a customer number from defendant. The customer number granted Lakefield the authority to sell, distribute and install defendant's product. Lakefield would submit purchase orders to defendant's California office and defendant would fill them.

12. As a distributor of defendant, Lakefield also received marketing bulletins, pricing manuals, and support letters. The support letters were sent by defendant to customers of Lakefield. The letters, which were essentially identical to one another, told the customer that if for some reason Lakefield Telephone was unable to provide parts and technical service, then defendant Northern Telecom would step in and provide the service.

13. The discussions between Thomas Nass, Elroy Nass, Benson, and Vande Hey on Lakefield's distributorship did not contemplate solely the business of Lakefield. The new Telecom North was to have a role as Lakefield's exclusive agent in the sale of defendant's products.

14. On April 3, 1984, Thomas Nass, Elroy Nass, Vande Hey and Benson met with Mike Procaccio, District Sales Manager for defendant. Thomas Nass informed Procaccio that Lakefield would be working through Telecom North in the sale of defendant Northern Telecom's product. Procaccio warned the parties about defendant's dim view on brokering—selling products to another party that would then resell the product to the ultimate consumer. Defendant Northern Telecom wanted its distributors to sell products only to "end users" so that defendant would not be further removed from the customer and could respond to customer concerns, if necessary. Thomas Nass, Elroy Nass, Vande Hey and Benson did not think this was a problem in their situation since Lakefield was still to be responsible to the "end user."

15. By way of a letter dated June 7, 1984, Lakefield informed defendant Northern Telecom of Lakefield's use of the third-party Telecom North.

16. In further response to defendant's concerns, Lakefield and Telecom North, on July 9, 1984, memorialized their relationship by entering into an "Exclusive Sales and Marketing Agency Agreement." The agreement was entered into evidence as Exhibit No. 9. The entire agreement is incorporated herein.

17. The 27–page agreement stated that Lakefield appointed Telecom North as Lakefield's "complete and exclusive sales and marketing agent" for defendant's product and gave Telecom North "complete and exclusive authority, responsibility and power" for "the sale, marketing, distribution, installation, servicing, invoicing, advertising, and promotion" of defendant's product. Lakefield was to perform engineering and technical services when required by Telecom North. Lakefield agreed to refer to Telecom North all in-

quiries and requests regarding defendant's product and agreed to notify Telecom North if a threat arose to the supply of defendant's product. Under the agreement, Lakefield, if told to do so by Telecom North, had to assign to Telecom North all rights, claims and causes of action against defendant that arose as a result of a termination of the supply of products. Furthermore, Lakefield agreed that upon termination of the exclusive agency agreement, Lakefield would not sell any of defendant's products to anyone for a period of five years.

18. Thomas Nass and a clerk were the only Lakefield employees to work on the sale and service of defendant's products. Thomas Nass estimated that the clerk worked only part time on Northern Telecom business. He further estimated that he spent about 90 percent of his time on the distribution of defendant's products. Lakefield paid Thomas Nass a salary of $40,000 a year during 1984 and 1985. During 1984, Lakefield spent a total of $49,000 on the distribution of defendant's product, which included the salary of Thomas Nass; and in 1985, the total expenses were $93,000. In 1986, with Nass spending only about 40 percent of his time on the defendant's distributorship, Lakefield spent $36,000 on expenses; in 1987, the expenses were $42,000. The total investment of plaintiff in the sale of defendant's product was $220,000. Plaintiff's total revenue for that same period was $163,000, for a net loss of about $57,000 over the four-year period. The figures, which were introduced by Thomas Nass, showed a profit of $84,000 for 1985. The total loss was attributed to customer uncertainty over Lakefield's status as a seller of defendant's product.

19. In 1984, Lakefield, through Telecom North, sold more that $500,000 of defendant's product (in price paid to defendant); in 1985, the sales were more than $1.5 million. At the time of trial, total sales for the four years were $2.8 million.

20. All the sales of defendant's products by Lakefield were made through salesmen for Telecom North, although Thomas Nass did accompany them on certain sales trips. After the sale was made, the customer would pay Telecom North, which would then pay plaintiff Lakefield, which would then pay defendant Northern Telecom.

21. Defendant Northern Telecom's attitude toward the third-party arrangement was a case of the right hand not knowing what the left hand was doing—or rather, the right hand not telling the left hand what it was doing. Procaccio, his boss Windy Frieder, and his boss Gene Morrison, were aware of the third-party arrangement and its possible infringement on defendant's policy against brokering. But the three tolerated the arrangement and, by their express acquiescence of it, bound defendant to the arrangement as part of the agreement between plaintiff and defendant. An example of the defendant's acquiescence was when Morrison wrote a letter in June of 1984 to a customer of Lakefield, stating that there was a relationship in good standing between Northern Telecom and Telecom North, Inc. The three were obviously motivated by the commissions and bonuses they received off the sales. For example, in 1984, Morrison, with a base salary of only $60,000, made a total salary of $242,000. On the other hand, the next level of management for defendant was not happy with the arrangement between Lakefield and Telecom North, regardless of the financial success. Charles Young, a vice president who was Morrison's superior for most of the time period relevant to this case, was concerned that Lakefield was not going to be responsible to the ultimate consumer of the product. He also had concern about using Telecom North since Telecom North also sold products of defendant's competitors.

22. Moreover, Young was responsible when a competitor of Lakefield, Wisconsin Bell, began complaining about Lakefield's arrangement with Telecom North, which Wisconsin Bell saw as brokering. But others in defendant's company, particularly Morrison, pointed out that the brokering of defendant's products by distributors, including Ameritech companies, was rampant

throughout the United States and clamping down on Lakefield would be unfair.

23. Young and others at Northern Telecom, in a series of communications with Lakefield during 1985, informed Lakefield that Northern Telecom would continue to sell to Lakefield only if Lakefield was the company actually doing the selling to the end user. In one letter, Young said that Lakefield should begin looking for a new supplier. He said that in the interim, a wind-down period would take place where Northern Telecom would honor Lakefield's existing customer base as far as needed for additions, maintenance, changes in service, spare parts—essentially everything but new service.

24. In another correspondence (Exhibit 23), defendant Northern Telecom stated that it had reviewed the Lakefield–Telecom North agreement and as a result Northern Telecom determined that Lakefield is not a distributor of Northern Telecom products. The letter resulted in a series of letters between both parties and their attorneys and culminated with a letter from Young to Elroy Nass dated April 12, 1985, wherein Young stated that Northern Telecom would sell the SL–1 to Lakefield only in the case where there existed a contract between Lakefield and the end-user and where Lakefield was totally responsible for the satisfaction of the company.

25. In response, Lakefield and third-party Telecom North changed the customer sales contracts they used to reflect that Lakefield was responsible to the consumer for the sale. The change was strictly in form.

26. During the summer of 1985, after Young had intensified his objections to Lakefield, others at defendant Northern Telecom were arranging for a field test for a new product of defendant's. The parties involved were Northern Telecom, Proctor & Gamble of Green Bay, Lakefield, and Telecom North. The Field Trial Plan, prepared by Northern Telecom, listed Lakefield as defendant's local representative and also listed a role in the test for Telecom North.

27. In March of 1986, defendant Northern Telecom presented Lakefield with a 37–page standard written distribution agreement. No previous written agreement had been used. The proposed agreement, exhibit No. 33, would have restricted Lakefield's sale of defendant's products to the area in which Lakefield supplied dial tone service—Manitowoc County, where potential sales of the SL–1 were essentially nonexistent. Previously Lakefield had sold defendant's products throughout the state. The proposed agreement also would have prevented Lakefield's use of Telecom North, Inc.

28. This proposed standard agreement was rejected by Lakefield in a letter dated April 9, 1986, from Thomas Nass to Alan I. Frazier, defendant's director of distributor marketing. The proposed agreement was also presented to about 160 independent telephone companies that sold defendant's products; however, each proposed agreement varied as to the territory covered. About 100 of the companies also refused to sign it.

29. Plaintiff filed suit May 2, 1988. Defendant's answer did not deny that the distributorship had been terminated. No evidence was presented that any of the other 100 companies who refused to sign the proposed agreement were terminated from their distributorships.

30. Without a continuation of the distributorship between plaintiff and defendant, plaintiff's Business Services Division will go out of business and the company will revert to its pre–1984 form.

31. Lakefield was damaged by defendant's termination of the distributorship, from the time of termination to the date the Court entered the preliminary injunction, in the amount of $40,000. The defendant's expert testimony that Northern Telecom saved Lakefield $4,000 by terminating the distributorship was against the great weight of the evidence. The figure also ignored the fact that supplying Thomas Nass with a salary was one of Lakefield's reasons for establishing the Business Services Division.

32. Despite the Court's entry of a preliminary injunction to maintain the status quo, plaintiff suffered an additional $20,000 worth of damages from the termination from the date of the injunction through December 31, 1987.

### B. *Conclusions of Law*

 The Court begins by addressing the issue of the jury's Special Verdict. Defendant, at page 27 of its Brief in Support for Judgement of Dismissal or for a New Trial, makes much of what it sees as "uncertainty" over which questions were advisory and which questions were binding. The Court is amused by this position since it was the position of defendant at the start of trial that led to any "significant tactical considerations" that defendant was forced to make. Plaintiff elected equitable relief and waived any right to a jury on past damages. Defendant insisted it was entitled to a jury trial on all factual questions. The Court subsequently held that the jury would issue an advisory verdict on factual questions underlying an application of the Wisconsin Fair Dealership Law, but that the jury would issue a binding decision on the past damages claim. The Court then told the parties that further discussion on which questions were binding would not be foreclosed. Nothing presented by defendant persuades the Court that its initial characterization of the issues was in error: a determination of whether a violation of the Wisconsin Fair Dealership Law occurred is a question of law; the factual inquiries underlying the alleged violation are fair game for an advisory jury, but are not binding on the Court when equitable relief is being sought. The jury's determination of past damages will be binding since that is a remedy at law, *see Ross v. Bernhard*, 396 U.S. 531, 533, 90 S.Ct. 733, 735, 24 L.Ed.2d 729 (1970), and since defendant did not waive its right to a jury trial on the issue. Furthermore, the Court would note that its factual findings above are consistent with the Special Verdict questions essentially making the issue moot.

The Wisconsin Fair Dealership Law is put forth at Chapter 135, Wis.Stats. Two recent cases by the Wisconsin Supreme Court, *Bush v. National School Studios, Inc.*, 139 Wis.2d 635, 407 N.W.2d 883 (1987), and *Zeigler Co. Inc. v. Rexnord Inc.*, 139 Wis.2d 593, 407 N.W.2d 873 (1987), discuss in detail the nature of the statute and the policies giving rise to its enactment. In order to recover for an alleged violation of the law, a plaintiff must first establish that it is protected by the law in its dealings with another company. To establish that protection, plaintiff must show:

"1. a contract or agreement between two or more persons;

2. by which a person is granted

a. the right to sell goods or services;

b. the right to distribute goods or services; or

c. the right to use a trade name, trademark, logotype, advertising, or other commercial symbol; and

3. in which there is a community of interest in the business of

a. offering goods or services;

b. selling goods or services; or

c. distributing goods or services at wholesale, retail, by lease, agreement or otherwise."

*Bush v. National School Studios*, 139 Wis. 2d at 651–652, 407 N.W.2d at 890–891 (*quoting Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 763, 300 N.W.2d 63 (1981)).

In the case at hand, the first two elements are easily established. By the testimony of defendant Young, independent telephone companies like plaintiff receive the right to sell defendant's products when given a customer number. There is no dispute that plaintiff was given that account number on March 19, 1984, and that thereafter plaintiff began submitting purchase orders to defendant, which subsequently fulfilled those orders and received payments for doing so. Defendant contends no agreement was made because there was no meeting of the minds on essential elements of the agreement, such as the status of Telecom North. In light of the record of this case, the Court is unper-

suaded that material terms were lacking in the agreement. The parties transacted more than a million dollars worth of business over a period of about two years. Products were ordered and payments were made. It is hard to envision what terms went unmet while these transactions were taking place. As to Telecom North and the "end user" dispute, the confusion was solely an internal conflict among employees of defendant. Pracaccio, Frieder and Morrison were aware of plaintiff's use of the third party and had no problems with it. The three made no manifestations to plaintiff that the use of the third party was a material issue of the agreement yet to be decided. The Court has no doubts that Young and others within defendant Northern Telecom never acquiesced to the use of the third party; however, the actions of Praccacio, Frieder and Morrison—the three that dealt most directly with plaintiff— were sufficient to bind defendant in an agreement which included the use of Telecom North. *See* Devitt & Blackmar, section 71.09 (1983) (corporation may only act through employees and is bound by acts of employees performed within scope of their duties); *see also* Wis.Civil J.I. section 4000 *et seq.*

There is no dispute that Lakefield, by virtue of the customer number, was given the right to sell and distribute defendant's products. Thus, the second necessary element for protection under the statute also is met.

The Court now turns to the "troublesome third element, community of interest, the element which most distinguishes dealerships from the other forms of business agreements." *Zeigler v. Rexnord,* 139 Wis.2d at 600, 407 N.W.2d at 877. In debating this point, the parties center on the numerous factors put forth by the Wisconsin Supreme Court for consideration of whether a community of interest exist. Plaintiff argues that it made a substantial investment in the furtherance of the Northern Telecom dealership in the amount of $237,000.[1] Furthermore, a continuing financial interest and interdependence between the companies was established by the following factors:

(1) shared goals and coordinated efforts (including Northern Telecom making Lakefield an authorized distributor, granting Lakefield access to confidential materials, participating together in sales and service, providing support letters to Lakefield's customers, and joining with Lakefield in the testing of new products);

(2) Lakefield assumed substantial risks and responsibilities (including setting the price and assuming the risk of nonpayment);

(3) Lakefield provided extensive supplementary services to customers following installation of defendant's product;

(4) Lakefield derived substantial revenues from the sale of defendant's products (net revenues totalled $163,000 and accounted for ⅙ or ⅐ of plaintiff's total profits); and

(5) Lakefield's investment was significant (including the $237,000 [2] in expenses and 90 percent of Thomas Nass' time).

Defendant responds with the following factors:

(1) the length of time the parties did business was two years, but only the first six months were free from controversy;

(2) the extent and nature of the obligations were vague since there was no express agreement;

(3) the time of Thomas Nass and one clerical worker was not a significant investment of resources;

(4) Lakefield lost money on its dealings with defendant's product;

(5) Lakefield's territory was not defined;

(6) the investment by Lakefield was only at the behest of the third party, Telecom North;

(7) only one employee devoted full-time work to the distributorship; and

---

1. The Court found Lakefield's total investment to be $220,000. *See* Finding of Fact No. 18.

2. *See* n. 1, *supra.*

(8) the supplementary services to customers were performed by Telecom North.

The factors put forth by the parties fit into the various "facets" described by the Wisconsin Supreme Court in *Zeigler v. Rexnord* for determining whether (1) the grantor and grantee have a continuing financial interest in the business relationship such that a community of interest exists, or (2) whether the business relationship is so interdependent that there is a community of interest. *See Zeigler v. Rexnord*, 139 Wis.2d at 600–606, 407 N.W.2d at 878–880. These two "guideposts" are derived from the statute to determine whether the community of interest factor is met, based on a judicial examination of the totality of circumstances concerning the actual dealing between the parties. 139 Wis.2d at 604–605, 407 N.W.2d at 879. "[The two guideposts] should assist courts in parsing the facts in an individual case and help sharpen the focus of a court's inquiry into the existence of a community of interest between an alleged grantor and dealer without robbing the concept of community of interest of the flexibility which the legislature intended it to have." 139 Wis.2d at 605, 407 N.W.2d at 879. The Wisconsin Supreme Court emphasized, however, that the courts, in determining whether a community of interest exists, should not restrict its inquiry to any one facet of the business relationship. *Id.* The court then gave 10 examples of facets that could be considered, *see Id.*, 139 Wis.2d at 606, 407 N.W.2d at 879, which the parties attempted to pigeon-hole as seen above. The state court, however, stated that the list of 10 "facets" was not inclusive, 139 Wis.2d at 606, 407 N.W.2d at 879. Furthermore, as demonstrated by the *Bush* case, the courts need not mechanically apply all ten "facets" before making its determination. *See* 139 Wis.2d at 654–656, 407 N.W.2d at 880.

Leaving aside for the moment plaintiff's third-party agreement, the Court would opine that the relationship of plaintiff and defendant otherwise meets the third requirement of community of interest. Lakefield's $220,000 total investment would qualify as a substantial investment. *See*

*Bush*, 139 Wis.2d at 655, 407 N.W.2d at 892 ($17,000 payment for territorial rights constituted substantial financial investment). Furthermore, the Court would find that an interdependence existed between the parties. Lakefield was made an authorized dealer, with access to confidential pricing information. Northern Telecom provided Lakefield with sales and service support, including support letters to Lakefield's customers. The parties worked together in a field test of a new Northern Telecom product. The interdependence also was demonstrated by the revenues derived in the sale of defendant's product and by the fact that plaintiff's Business Services Division was specifically created to distribute defendant's products.

But the question remains as to whether this otherwise protected relationship is changed by the agreement between plaintiff and the third party, Telecom North. That third-party agreement essentially made Telecom North the distributor of defendant's products. Plaintiff gave to the third party all its rights to sell defendant's product. The third party decided which customers to sell to, negotiated and set the price of the product, and collected the payments. The third party directed plaintiff when to purchase products from the defendant and the third party decided when Thomas Nass would provide engineering and technical services. Moreover, plaintiff could not sell defendant's product for a period of five years after termination of the agency agreement. Plaintiff still had a financial stake in its initial arrangement with defendant and still profited from the sales, but that stake was totally controlled by the third party. The third party in essence has received plaintiff's statutorily-protected position as dealer of the defendant's goods, with the plaintiff's position relegated to that of middleman and, at times under the service terms of the agreement, employee of the third party. The issue before the Court, then, is whether the Wisconsin Fair Dealership Law protects the plaintiff's middleman position.

■ As seen above, if the Court were to apply the "guideposts" set forth by the

Wisconsin Supreme Court in *Zeigler*, the plaintiff would still be protected. But as the Wisconsin Supreme Court also has stated, in determining whether the community of interest element exists, the courts "should not focus solely on the telltale trappings of the traditional franchise. Rather, courts should consider the overriding principle of whether the business' status is dependent upon the relationship with the grantor for its economic livelihood." *Bush*, 139 Wis.2d at 651, 407 N.W. 2d at 890. Also, in construing the statute to determine if a community of interest exists in plaintiff's situation, the Court, under the rules of statutory construction, must give effect to the intent of the Wisconsin legislature. *See Marshall–Wisconsin Corporation v. Juneau Square*, 139 Wis.2d 112, 133, 406 N.W.2d 764 (1987). In the unique case at hand, the Court finds that when an otherwise protected party agrees to transfer its protected interest to a third party, the otherwise protected party destroys the community of interest and removes that party from the protection of the Fair Dealership Law. The Court's conclusion is based on the express intent of the dealership law, which was to protect dealers against unfair treatment from grantors. Section 135.025(2)(b). That concern is lost when the interest of the otherwise protected party rests not on the dealership of the particular goods or services involved, but on the very existence of a dealership arrangement. The Court does not find that the intent of the law, through the community of interest requirement, included the protection of dealers who take their right to buy or sell a product or service and transfer that right to a third party. Such a finding would not promote the compelling interest of the public in fair business relationships between dealers and grantors, *see* § 135.025(2)(a), but rather would do nothing more than encourage Wisconsin dealers to shop around their statutory protections.

The mom-and-pop grocery store that buys its products from a national distributor would suddenly find that its most profitable course of action would be to market its position to other companies looking for a protected supply of the distributor's products. Just as long as mom and pop have the right to buy or sell the distributor's product, and as long as mom and pop develop some kind of financial dependency on the flow of products from the national distributorship (and how could they not by the attractive nature of the position?), then mom and pop's new agency position will be protected. Just as companies now flock to Delaware to take advantage of incorporation laws, so would companies flock to Wisconsin to sign exclusive agency agreements. The case at hand fits that scenario almost exactly: A five-employee telephone company receives the right to buy and sell telephone products from defendant. That right is transferred to a third party that has 150 employees and desires a protected source of supply of defendant's product. The five-person telephone company now has more of a financial interest in protecting its new "middleman" status than in actually buying or selling the defendant's products. The community of interest between plaintiff and defendant in plaintiff's sale of telephone products becomes non-existent. Plaintiff becomes dependent only on the right to sell the products (and the transfer of that right to a third party), and not on any dealership of the product that plaintiff may develop on its own. Since the Court finds that the Wisconsin legislature did not intend that the Fair Dealership Law establish Wisconsin dealers as the nations' "middlemen," the Court finds that by assigning to Telecom North its entire right to purchase defendant Northern Telecom's products, plaintiff Lakefield destroyed its community of interest with defendant and removed itself from the protection of the Wisconsin Fair Dealership Law.[3]

3. The Court's conclusion is contrary to its finding on the ramifications of the third-party agreement in the *Decision and Order* resolving the preliminary injunction motion. The "well settled" rule in the Seventh Circuit is that preliminary injunction determinations do not bind a court in the subsequent trial on the merits. *Lektro–Vend Corporation v. Vendo Corporation*, 660 F.2d 255, 264 (7th Cir.1981). "The purpose of a preliminary injunction is not to conclude the merits of the controversy, but merely to

Therefore, plaintiff is not protected by the law and cannot bring a claim for relief pursuant to it. Plaintiff's case will be dismissed. Judgment will be entered in favor of the defendant.

## III. PLAINTIFF'S CONTEMPT MOTIONS

Plaintiff's two contempt motions claim that during the time the parties were bound by the preliminary injunction, defendant failed to comply with the condition of the injunction that the parties abide by terms and conditions of its business relationship as it existed prior to April 22, 1986. Plaintiff claims that defendant (1) failed to respond to inquiries from Lakefield's agent, Telecom North, to defendant Technical Assistance Center, as defendant did prior to April 22, 1986, and (2) failed to send a representative to meet with an existing customer (Aid Association for Lutherans) concerning proposed upgrade in the customer's SL–1 system. In response to the first point, defendant does not contest plaintiff's factual assertion, but rather contends that the question of whether Telecom North was part of the pre-April 22 business relationship was not resolved by the preliminary injunction. Defendant argues the status of Telecom North was an issue for trial. In response to the second contempt motion, defendant documents the history of its dealings with Aid Association for Lutherans and contends that travelling to Wisconsin to meet with a representative of that group would not be economical. Defendants argue that holding a telephone conference or having the Aid Association travel to defendant's new presentation center in Dallas, Texas, which defendant proposed, was a proper course of action and was consistent with the course of proceedings mandated by the Court's injunction.

On the first contempt allegation, the Court finds that even though the status of Telecom North was an issue for trial, defendant did not have proper grounds for refusing to to treat the Lakefield–Telecom North relationship as part of the status quo. The Court's *Decision and Order* preserve the status quo until a more considered

granting the preliminary injunction made clear that the third-party relationship was not foreclosed and in fact (based on the record before the Court at that time) was part of the dealership granted by defendant. *See* 656 F.Supp. 818. As to the second contempt allegation, the Court does not find that the clear and convincing evidence established that defendant had violated the injunction a second time by refusing to assist Lakefield with a customer seeking an upgrade of its SL–1 system.

A finding of civil contempt must be based upon clear and convincing evidence that the Court's order has been violated. *Rototron Corp. v. Lakeshore Burial Vault Company*, 553 F.Supp. 691, 698 (E.D.Wis.1982), *aff'd*, 712 F.2d 1214 (7th Cir.1983). Although the injunction has been dissolved by the Court's decision herein, the integrity of the Court's order is still at issue in plaintiff's motions. The Court felt that the evidence produced at trial established that defendant had not faithfully abided by either the letter or the spirit of the Court's injunction and the clear and convincing evidence now produced by plaintiff in the first contempt motion reinforces the Court's feeling. Therefore, the Court, pursuant to its inherent authority, *see* 18 U.S.C. § 401(3), finds defendant in civil contempt for its failure to abide by the Court's preliminary injunctions. The Court will sanction defendant in an amount of $2,000 to be paid to plaintiff to offset its damages and attorney's fees arising from the contempt violation.

## IV. SUMMARY

Based on the decision above, the Court finds that plaintiff's agreement with defendant is not protected by the Wisconsin Fair Dealership Law, Chapter 135, Wis. Stats. As a result, plaintiff can maintain no cause of action against defendant for claims arising under the statute. Accordingly, plaintiff's claim for relief under the Fair Dealership Law is hereby DISMISSED with prejudice. Judgment shall be entered in favor of the defendant. The Court's decision on the merits is possible." *Id.*

preliminary injunction, entered February 18, 1987, is hereby DISSOLVED. The Clerk of Court shall return to plaintiff the bond posted as security for the injunction.

The Court further finds that plaintiff has established by clear and convincing evidence that defendant has violated the Court's preliminary injunction order. Accordingly, the Court hereby FINDS defendant in contempt of Court and SANCTIONS defendant in the amount of $2,000. The sanction shall be paid to plaintiff to offset plaintiff's damages and attorney's fees incurred as a result of the violation of the injunction. The sanction shall be paid directly to plaintiff within 30 days of the date of this decision.