**C.L. THOMPSON COMPANY, INCORPORATED, Plaintiff,**

v.

**FESTO CORPORATION, Defendant.**

**No. 89–C–0116.**

United States District Court, E.D. Wisconsin.

March 8, 1989.

Andrew O. Riteris, Jeewon K. Chung and Joshua L. Gimbel, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff.

Michael A. Bowen and Richard M. Esenberg, Foley & Lardner, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

WARREN, Chief Judge.

C.L. Thompson Company, Inc. moves for a preliminary injunction enjoining Festo Corporation from terminating C.L. Thompson's Festo distributorship and enjoining Festo from opening up its own factory distribution center. The Court, however, finds no basis for the injunction either under the contract governing the distributorship or under the Wisconsin Fair Dealership Law, Chapter 135, Wis. Stats. Thus, the Court denies the motion for a preliminary injunction.

### I. BACKGROUND

On January 20, 1989, C.L. Thompson filed a complaint in the Milwaukee County Circuit Court and obtained an *ex parte* temporary restraining order prohibiting Festo from terminating or substantially changing the competitive circumstance of C.L. Thompson's dealership until February 9, 1989, at which time a hearing to show cause was scheduled. On January 27, 1989, Festo removed the case from Milwaukee County Circuit Court to the United States District Court for the Eastern District of Wisconsin. This Court then scheduled an evidentiary hearing on the preliminary injunction motion for Friday, February 10, 1989. The hearing was held Friday, February 10, 1989, and Monday, February 13, 1989.

### II. FACTS

 The following facts were presented to the Court during the evidentiary hearing.[1]

---

1. The Court will not consider Mr. Klimowicz's supplemental affidavit submitted with the plaintiff's brief in support of its motion for a preliminary injunction. The plaintiff chose to submit a

Festo is engaged in the manufacture and distribution of pneumatic products such as fittings, tubings, valves and cylinders. C.L. Thompson is a fluid power products distributor engaged in the sale of hydraulic and pneumatic components and systems. (Transcript of proceedings on February 10, 1989 at 5.) On January 14, 1986, C.L. Thompson, then owned and managed by Robert Thompson (hereinafter referred to as C.L. Thompson (Thompson)), entered into its most recent written agreement with Festo. (Agreement.) Under this Agreement, C.L. Thompson was appointed as an authorized distributor of Festo's line of products in the State of Wisconsin and Upper Peninsula of Michigan. As a distributor, C.L. Thompson (Thompson) was required to maintain a running inventory of Festo products of at least $10,000.00. (Agreement, paragraph 2.) In addition, C.L. Thompson maintained a trained sales staff and a repair facility for its customers. (Transcript at 11.) C.L. Thompson's (Thompson) total sales figure in 1988 was approximately $5.2 million. (Transcript at 9–10.) Of that, approximately $800,000, or 15%, was due to sales of Festo products. (Transcript at 10.)

During 1988, Mr. Thompson was negotiating for the sale of C.L. Thompson to Intek Industries, a holding company managed by Jerry Klimowicz and Bob Blahut. (Transcript at 11.) Sometime between December 5 and December 10, 1988, Mr. Thompson, Mr. Klimowicz and Mr. Blahut reached a preliminary agreement on the price and terms of the sale of C.L. Thompson. (Transcript at 48.) On December 12, 1988, Mr. Klimowicz talked to Mr. Scholz, the vice president of Festo, and informed Mr. Scholz that he was in the process of finalizing the purchase of C.L. Thompson and the deal would be closed on either December 30 or 31, 1988. (Transcript at 17.) Mr. Scholz congratulated Mr. Klimowicz on his purchase of C.L. Thompson. (Transcript at 51.) Mr. Klimowicz thereafter interpreted Mr. Scholz's congrat-

ulations as a consent to the sale of C.L. Thompson. (Transcript at 51.)

On January 3, 1989, C.L. Thompson opened for business under the management of Mr. Klimowicz and Mr. Blahut (hereinafter referred to as C.L. Thompson (Klimowicz)). (Transcript at 18.) On January 4, 1989, Mr. Scholz called Mr. Klimowicz and arranged to visit C.L. Thompson (Klimowicz) on January 5, 1989. (Transcript at 18.) One day following the meeting, on January 6, 1989, Festo sent a letter of termination to C.L. Thompson (Klimowicz). (Exhibit One.) The letter stated as follows:

C.L. Thompson Company, Inc.

1585 West Overland Drive

New Berlin, Wisconsin 53151

Gentlemen:

We hereby terminate your Festo distributorship (dealership) effective ninety (90) days from your receipt of this letter.

The reason for the termination of your distributorship (dealership) is the sale of C.L. Thompson Company, Inc. and the change of management without the prior consent of Festo as required by Paragraph Eleventh of the distributor agreement dated January 14, 1986.

Under the provisions of the Wisconsin Fair Dealership Act you have sixty (60) days to rectify this deficiency.

At your option, in accordance with the Wisconsin Fair Dealership Act, we are willing to repurchase your Festo inventory at its fair wholesale market value.

Yours truly,

Joseph J. Saccardi

On January 11, 1989, Mr. Klimowicz contacted Mr. Saccardi regarding the termination letter and was directed to speak with Horst Saalbach, president of Festo. (Transcript at 23.) During a phone conversation on January 16, 1989, Mr. Saalbach stated that he was unhappy with U.S. distributors as a whole and felt that Festo could do a better job selling directly. (Transcript at 24.) He also stated that his

brief in lieu of closing arguments, thus no new evidence should have been submitted with the briefs.

decision to terminate was irreversible.[2] (Transcript at 25.)

On January 15, 1989, Festo ran an advertisement in the Sunday *Milwaukee Journal* for "talented individuals for [a] newly created branch sales office in Milwaukee." (Exhibit Two.) Festo has plans to open a factory distribution center on 126th and Capitol in Milwaukee, Wisconsin. (Transcript at 163.)

## III. DISCUSSION

The following prerequisites for issuance of a preliminary injunction are well-established:

(1) Plaintiff has no adequate remedy at law or will be irreparably harmed if the injunction does not issue; [irreparable harm means that the plaintiff is unlikely to be made whole by an award of damages or other relief at the end of trial. *Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 599 (7th Cir.1984)];

(2) The threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(3) The plaintiff has a reasonable likelihood of success on the merits; and

(4) The granting of a preliminary injunction will not disserve the public interest.

*Roland v. Air Line Employees Ass'n Intern.*, 753 F.2d 1385, 1392 (7th Cir.1985). In determining whether these prerequisites exist, the Court "must make factual determinations on the basis of a fair interpretation of the evidence ..." and "must draw legal conclusions in accord with a principled application of the law." *Lakefield Telephone Co. v. Northern Telecom, Inc.*, 656 F.Supp. 813, 815 (E.D.Wis.1987) later proceeding 679 F.Supp. 881 (E.D.Wis.1988), dismissed 696 F.Supp. 413 (E.D.Wis.1988) (quoting *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir.1986)). For the issuance of a preliminary injunction plaintiff must prevail on all four factors. Under the circumstances of this case, it will be necessary for the Court to address in detail only the third prerequisite for issuance of a preliminary injunction, plaintiff's likelihood of success on the merits.

## IV. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. *Termination of the Dealership*

The Wisconsin Fair Dealership Law is put forth at Chapter 135, Wis. Stats. Two recent cases by the Wisconsin Supreme Court, *Bush v. National School Studios, Inc.*, 139 Wis.2d 635, 407 N.W.2d 883 (1987), and *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis.2d 593, 407 N.W.2d 873 (1987), discuss in detail the nature of the statute and the policies giving rise to its enactment. In order to recover for an alleged violation of the law, a plaintiff must first establish that it is protected by the law in its dealings with another company. To establish that protection, the plaintiff must show:

1) a contract or agreement between two or more persons;

2) by which a person is granted

a) the right to sell goods or services;

b) the right to distribute goods or services;

c) the right to use a trade name, trademark, logotype, advertising, or other commercial symbol; and

3) in which there is a community of interest in the business of

a) offering goods or services;

b) selling goods or services; or

c) distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

*Bush v. National Schools*, 139 Wis.2d at 651–652, 407 N.W.2d at 890–891 (quoting *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 763, 300 N.W.2d 63 (1981)).

Community of interest is the criteria that most distinguishes dealerships from the other forms of business agreements. *Lakefield Telephone Co. v. Northern Telecom, Inc.*, 696 F.Supp. 413, 420 (E.D.Wis. 1988) (quoting *Ziegler v. Rexnord*, 139 Wis. 2d at 600, 407 N.W.2d at 877). In determining whether a community of interest

---

**2.** In the event that it can be shown that the Wisconsin Fair Dealership Law applies to C.L. Thompson (Klimowicz), the Court is troubled by this apparent disregard for the cure period.

exists, the Court "must not restrict its inquiry to any one facet of the business relationship, but rather must examine a wide variety of facets, individually and in their totality, as evidenced in the actual dealing of the parties and in their contract or agreement." *Ziegler v. Rexnord,* 139 Wis.2d at 606, 407 N.W.2d 873.

Facets which a court should examine to determine whether the grantor and grantee have a continuing financial interest in the business relationship and whether the business relationship is so interdependent that there is a community of interest include: how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services. Each of these facets may relate to one or both of the guideposts and we do not intend this list to be all inclusive.

*Ziegler v. Rexnord,* 139 Wis.2d at 606, 407 N.W.2d 873.

### 1. *Community of Interest*

■ After examining these factors, the Court concludes that C.L. Thompson (Klimowicz) and Festo do not share a community of interest. The Court notes that whether C.L. Thompson (Thompson) and Festo shared a community of interest is a separate question that need not be addressed here. Even if C.L. Thompson (Thompson) and Festo shared a community of interest and C.L. Thompson (Thompson) were protected by the Wisconsin Fair Dealership Law as a dealer, that status is personal in nature and dependent on the dealings of the parties and their agreement; it is not transferable. As this Court previously stated in *Lakefield Telephone Co. v. Northern Telecom, Inc.,* 696 F.Supp. 413, 422 (E.D.Wis.1988):

"when an otherwise protected party agrees to transfer its protected interest to a third party, the otherwise protected party destroys the community of interest and removes that party from the protection of the Fair Dealership Law. The Court's conclusion is based on the express intent of the dealership law, which was to protect dealers against unfair treatment from grantors. Section 135.025(2)(b). That concern is lost when the interest of the otherwise protected party rests not on the dealership of the particular goods or services involved, but on the very existence of a dealership arrangement. The Court does not find that the intent of the law, through the community of interest requirement, included the protection of dealers who take their right to buy or sell a product or service and transfer that right to a third party."

■ The question at hand therefore requires examining C.L. Thompson (Klimowicz) and Festo's business relationship, which was of a short duration, lasting from January 3, 1989, to January 6, 1989. It is disputed whether the 1986 Agreement between C.L. Thompson (Thompson) and Festo governs the new relationship, nevertheless, the Court will look to that Agreement to determine the extent and nature of the obligations it imposes on a distributor. For example, paragraph two of the Agreement provides that the distributor shall provide regular and consistent sales and service coverage in its territory, including after-sales services. The Agreement provides that the distributor is to use its best efforts

to promote the sale of Festo products. The Agreement also provides that the distributor maintain adequate sales, service and warehouse facilities and representatives and adequate stock, including a running inventory of $10,000. The Agreement further provides that the distributor will furnish Festo with data relating to merchandising policies, and inform Festo after taking on any new line. The Agreement provides that the distributor will inform Festo in writing after the sale of any interest in the distributor. Finally, the Agreement provides that the distributor maintain a credit position satisfactory to Festo. Even assuming that the Agreement imposes these obligations on C.L. Thompson (Klimowicz), these obligations are only one facet of the inquiry, relating mostly to the question of whether the business relationship between C.L. Thompson (Klimowicz) and Festo is so interdependent that there is a community of interest.

The central dispute in this case is whether C.L. Thompson (Klimowicz) has a sufficient financial interest in a Festo distributorship to fall within the statutory requirement of community of interest. C.L. Thompson (Klimowicz) expected to earn 15% of its gross proceeds from Festo's products based on C.L. Thompson's (Thompson) prior performance. In 1988, for example, C.L. Thompson's (Thompson) sales figure was approximately $5.2 million. Of that, approximately $800,000, or approximately 15%, was due to sales of Festo products. C.L. Thompson (Klimowicz) argues that this percentage demonstrates a continuing financial interest in the distributorship. C.L. Thompson (Klimowicz) also argues that Festo already is the second largest product line carried by C.L. Thompson and it has the capability to become their largest line within five years. However, the Court's interest is in C.L. Thompson's (Klimowicz) present dependence on a Festo distributorship rather than any possible dependence five years from now. Even assuming that Mr. Klimowicz and Mr. Blahut could match $800,000 in sales of Festo products, $800,000 of $5.2 million, or 15%, is a small percentage of sales compared to C.L. Thompson's number

one line of products, Norgren, which accounts for approximately 50% of sales. This low percentage of sales attributable to Festo products, especially combined with the fact that Mr. Klimowicz and Mr. Blahut may never reach this sales figure, is "strong evidence, evidence that might ultimately be determinative ..., that there is no continuing financial interest between the parties in the operation of the business and thus no community of interest." *Ziegler,* 139 Wis.2d at 607; 407 N.W.2d at 880. The Wisconsin Fair Dealership Law is "primarily intended to protect businesses whose economic livelihood would be imperiled by the termination of the dealership" and not businesses "whose economic livelihood is not exclusively dependent on any one" manufacturer. *Foerster, Inc. v. Atlas Metal Parts,* 105 Wis.2d 17, 31, 313 N.W.2d 60, 66 (1981).

Neither do any of the remaining factors lend much support to C.L. Thompson's (Klimowicz) argument that they share a community of interest with Festo. C.L. Thompson (Thompson) was authorized to distribute Festo products in the State of Wisconsin and Upper Peninsula of Michigan, however, this grant of territory was not exclusive. Festo also retained the right to sell its products within the territory. In addition, C.L. Thompson (Klimowicz) has at the very most $10,000 invested in an inventory of Festo products. The 1986 Agreement requires the distributor to maintain a running inventory of $10,000. Even assuming that a portion of the $2,700,000 purchase price went toward maintenance of this inventory, C.L. Thompson (Klimowicz) has a small investment in inventory. Moreover, the Agreement provides that upon termination, Festo will accept return of any items in stock that can be returned to Festo's inventory for resale for credit at distributor's cost less a handling charge in the amount of 15% to be deducted from distributor's credit. Finally, the vice president of sales, Roy Wilmes, who played a large role with respect to the marketing of Festo products, resigned when he learned of the change in management, thus, C.L. Thompson (Klimowicz) has

at most one person, Dan Steele, devoted to the sale of Festo products. (Transcript at 21 and 128.)

Thus, the Court concludes that C.L. Thompson (Klimowicz) and Festo do not share a community of interest. Consequently, C.L. Thompson's (Klimowicz) business relationship with Festo is not protected by the Wisconsin Fair Dealership Law.

### 2. *Good Cause*

■ Even if the Court were to find that C.L. Thompson's (Klimowicz) business relationship with Festo is protected by the Wisconsin Fair Dealership Law, the Court believes that Festo had good cause for terminating the distributorship.

Wis.Stat. § 135.02(6) defines good cause as follows:

(a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed on him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

In the case at hand, the relevant requirement imposed on C.L. Thompson is contained in paragraph 11 of the 1986 Agreement:

Assignment: This agreement is personal in nature and the distributor's rights hereunder cannot be assigned, nor can the performance of its duties be delegated by the distributor without the prior consent of Festo.

In the event the current management sells a majority interest in distributor or ceases to personally manage distributor, Festo may immediately terminate this agreement.

C.L. Thompson (Klimowicz) argues that Festo has waived its rights to protest the change in the management of C.L. Thompson. This argument is based on a phone call on December 12, 1988, the contents of which are disputed. C.L. Thompson (Klimowicz) asserts that when Mr. Scholz was informed of the change in management, his response was to enthusiastically congrat-

ulate Mr. Klimowicz. C.L. Thompson (Klimowicz) further asserts that Mr. Scholz did not want any further information or meetings with Mr. Klimowicz and Mr. Blahut until the first week in February. Finally, C.L. Thompson asserts that the logical conclusion from such a response is that Festo had no problems with the change in management of C.L. Thompson.

Festo responds that it did not consent to a change in management during this phone conversation. Rather, Festo argues that it was confronted with a *fait accompli* and Mr. Klimowicz never actually asked for or received the consent of Festo. Festo's brief states: "Indeed, Mr. Klimowicz was unable to remember ever actually asking for or receiving consent, and was ultimately reduced to testifying that he based his conclusions on a 'warm and positive feeling' that he had after his phone conversation with Mr. Scholz." Brief at 16. (Transcript at 51.) The Agreement requires the prior consent of Festo and it appears that Mr. Klimowicz did not obtain Festo's prior consent. Thus, Festo has not waived its rights.

C.L. Thompson alternatively argues that Festo's protest over the management and ownership change is a sham reason for termination. C.L. Thompson argues that the sham is self-evident, that "Mr. Scholz's one hour, nominal meeting with the partners followed by an overnight decision to terminate C.L. Thompson because of a change in management is a sham." Brief at 14. Festo asserts that this is not true and that before Festo sent the termination notice, it had learned that:

(1) Plaintiff had lost one key sales and management person, and was in danger of losing more;

(2) the new owners were either uninformed or dishonest about their employees' attitudes;

(3) the new owners planned to emphasize hydraulics at the expense, as Festo saw it, of pneumatics;

(4) the new owners were negative about automatic controllers; and

(5) the new owners had attempted to concoct "consent" by Festo to an ownership and management change that Festo had had no opportunity to investigate.

At this stage in the proceedings, the Court is not convinced that Festo used the change in ownership and management as a sham reason for termination. Festo has legitimate reasons to be concerned about the ownership and management of its distributor, including concerns about a distributor's competence and trustworthiness. A jury in this case is likely to find that Festo had good cause for terminating C.L. Thompson's (Klimowicz) distributorship.

### B. *Opening Factory Distribution Center*

■ C.L. Thompson (Klimowicz) asserts that Festo's opening of a factory distribution center will substantially change the competitive circumstances of the dealership agreement. The Agreement provides as follows:

> Festo and the Distributor shall have the right to sell Festo's products and services in the Distributor's territory to manufacturing and industrial customers of every nature and description.

C.L. Thompson asserts that although the Agreement allows Festo to sell directly to customers, it does not grant Festo the right to open a distribution center for the purpose of selling Festo products. However, as Festo points out, the contract does not limit the methods Festo may use to exercise its right to sell products. Nor does the Wisconsin Fair Dealership Law. This Court held in *Brauman Paper Co. v. Congoleum Corp.*, 563 F.Supp. 1, 3 (1981), "that the appointment of a new dealer will not change the competitive circumstances of the dealership agreement for an existing dealer unless that agreement provides for exclusivity." C.L. Thompson would distinguish *Brauman* because it dealt with the right of a grantor to appoint another distributor within the original distributor's territory, not the right of a grantor to open a factory distribution center, which they claim "is a much more serious situation." Brief at 15. However, Mr. Scholz testified that Festo uses "no different discounts [than the distributor's], we work exactly the same way. There is no difference between the distributor or Festo." (Transcript at 70.) Thus, the Court finds that there is no evidence to support C.L. Thompson's argument that the Court should distinguish *Brauman*. Accordingly, the Court finds that the agreement allows Festo to open a factory distributorship and the Wisconsin Fair Dealership Law does not stand in its way.

### V. IRREPARABLE HARM

■ Wis.Stat. § 135.065 provides that "[i]n any action brought by a dealer against a grantor, any violation of this chapter is deemed an irreparable injury to the dealer for determining if a temporary injunction should be issued."

The Court, however, has determined that C.L. Thompson (Klimowicz) is not likely to succeed on the merits of its claim that Festo has violated the Wisconsin Fair Dealership Law. Thus, the Chapter 135 presumption does not apply to this case. As the Seventh Circuit said in *Fleet Wholesale Supply v. Remington Arms. Co.*, 846 F.2d 1095, 1098 (7th Cir.1988), the improbability of C.L. Thompson's (Klimowicz) prevailing on the merits "sealed the fate of its request for a preliminary injunction."

Thus, C.L. Thompson's (Klimowicz) motion for a preliminary injunction is DENIED. This case is scheduled for a four-day jury trial in a number two civil setting for Monday, May 22, 1989, at 10:00 a.m. There will be a final pretrial conference at *9:00 a.m. on Tuesday, May 16, 1989,* in Room 390, Federal Building, 517 East Wisconsin Avenue, Milwaukee, Wisconsin.

SO ORDERED.