ZIEGLER COMPANY, INC., a Wisconsin corporation, Plaintiff-Appellant-Petitioner,

v.

REXNORD, INC., a Wisconsin corporation, Defendant-Respondent. †

Supreme Court

*No. 86–0462. Argued May 29, 1987.—Decided June 25, 1987.*

(Also reported in 407 N.W.2d 873.)

† Motion for reconsideration filed.

For the plaintiff-appellant-petitioner there were briefs by *Steven J. Kirschner, Ross & Stevens, S.C.,* Madison, and of counsel *Lewis A. Remele, Jr., Gregory M. Weyandt* and *Rider, Bennett, Egan & Arundel,* Minneapolis, Minnesota, and oral argument by *Mr. Kirschner.*

For the defendant-respondent there was a brief by *William H. Levit, Jr., Michael B. Apfeld* and *Godfrey & Kahn, S.C.,* Milwaukee, and oral argument by *Mr. Levit.*

Amicus curiae briefs were filed by *William F. Nelson, Margaret A. Satterthwaite* and *DeWitt, Porter, Huggett, Schumacher & Morgan, P.C.,* Madison, for Wisconsin Council of the National Alliance of Franchisees and Dealers; and, *Michael A. Bowen* and *Foley & Lardner,* Milwaukee, for the J.I. Case Company.

SHIRLEY S. ABRAHAMSON, J.   This is a review of an unpublished decision of the court of appeals filed on July 15, 1986, affirming a summary judgment dismissing the complaint on the ground that the plaintiff, Ziegler Company, Inc. (Ziegler), was not a dealer within the meaning of the Wisconsin Fair Dealership Law (ch. 135, Stats. 1985–86).

The Wisconsin Fair Dealership Law (WFDL) provides among other things that a grantor of a dealership may not fail to renew a dealership agreement without good cause. Sec. 135.03, Stats. 1985–86. Ziegler claims to be a dealer for Rexnord, Inc. (Rexnord) and that without good cause Rexnord refused to renew Ziegler's dealership. Ziegler and Rexnord each moved for summary judgment in the circuit court, Ziegler asserting that as a matter of law Rexnord had no good cause for refusing to renew the dealership and

Rexnord asserting that as a matter of law Ziegler was not a dealer within the meaning of WFDL.[1]

The circuit court granted Rexnord's motion for summary judgment, holding that as a matter of law Ziegler was not a dealer within the meaning of WFDL because Ziegler and Rexnord did not share a community of interest. The court of appeals affirmed the judgment. Neither the circuit court nor the court of

[1]Each party filed a summary judgment motion in this case, each basing its motion on a different ground. Each party opposed the other's motion, filing responses addressing the issue raised by the other party in the other party's motion for summary judgment. Since the issue addressed in each motion was different, the motions were not reciprocal, and the court decides each party's motion on an individual and separate basis.

It may be argued that implicit in Ziegler's motion for summary judgment on the good cause issue is the claim that Ziegler is as a matter of law a dealer within the meaning of the Wisconsin Fair Dealership Act. In Ziegler's brief before this court, Ziegler states that it is entitled to summary judgment on the dealership issue as well as on the good cause issue. Nevertheless, we cannot say that the motions before the circuit court were truly reciprocal, because the motions addressed different issues. Moreover, the parties in this case did not agree on the legal standards applicable to the dealership issue. Thus, an issue of fact that might be material under one party's legal theory might be immaterial under another party's theory. In their briefs and in oral argument before this court the parties did not concede that the facts are undisputed; their briefs dispute the facts.

This court has stated that reciprocal motions for summary judgment may constitute a stipulation by the parties as to the facts in the case. *Powalka v. State Mut. Life Assurance Co.,* 53 Wis. 2d 513, 518, 192 N.W.2d 852 (1972); *Wiegand v. Gissal,* 28 Wis. 2d 488, 495a-95b, 137 N.W.2d 412, 138 N.W.2d 740 (per curiam opinion on rehearing) (1965). For a discussion of cross motions for summary judgment under the federal summary judgment rule, see Wright, Miller and Kane, *Federal Practice and Procedure,* Civil 2d sec. 2720 (1983).

appeals considered the "good cause" issue raised by Ziegler's motion for summary judgment.

There are two issues in the case as it comes before this court on review of the court of appeals' affirmance of the summary judgment. The central issue in this case is whether Ziegler is Rexnord's dealer within the meaning of WFDL—more specifically, whether the community of interest requirement for the existence of a dealership under ch. 135 is satisfied. A second issue, which we do not reach for the reasons set forth, is whether Rexnord's desire to increase the profitability (or reduce the losses) of its Process Machinery Division was good cause under secs. 135.02 (4) and 135.03, Stats. 1985–86, for its decision not to renew its agreement with Ziegler.

We conclude that the court of appeals and the circuit court erred by examining only one factor of the business relationship to determine the requisite community of interest. We further conclude that we cannot affirm the summary judgment by applying the correct legal test, because material facts are in dispute. Accordingly we reverse the court of appeals and remand the cause to the circuit court for further proceedings not inconsistent with this opinion.

I.

To clarify the dispute in this case, we briefly set forth the background facts on which the parties appear to agree. We will elaborate on the facts directly relevant to the dealership issue, including the disputed facts, when we discuss that legal issue.

Rexnord, a diversified, Milwaukee-based multinational, manufactures industrial equipment and components. Ziegler, a Wisconsin corporation, is generally

engaged in the distribution, sale and service of many lines of construction, mining and material-handling equipment. Thus, it is not surprising that the two companies might do business together, with Rexnord manufacturing certain equipment and Ziegler distributing that equipment in Wisconsin and elsewhere.

The contacts between the two companies date back to the 1920's, when Ziegler, Inc. (a Minnesota corporation that is Ziegler's sister corporation) became a distributor for Rex Chain Belts (a predecessor to Rexnord). Since that time, Ziegler, Inc. has acted as a distributor for various divisions of Rexnord.

In 1971, Ziegler, through its subsidiary General Tractor, became a machinery distributor in Minnesota, eastern North Dakota and eastern South Dakota for Rexnord's Process Machinery Division. This territory was expanded in 1978 to include western Wisconsin.

In 1980, Ziegler and Rexnord orally agreed that Ziegler would assume sales responsibility throughout Wisconsin for aggregate (rock crushing) equipment manufactured by Rexnord's Process Machinery Division. In 1981, this distributorship agreement was renewed in writing and ran from June 30, 1981, until June 30, 1984. During the three-year term of the distributorship, however, Rexnord decided not to renew the distributorship agreement.

The three years during which the distributorship agreement was in effect were not good ones for the aggregate equipment industry. In fact, according to Ziegler, these were the worst years for the aggregate equipment industry since the Great Depression.

Prior to the nonrenewal of the distributor agreement, Rexnord's products represented 8 percent, 2 percent, 1 percent and 5 percent of Ziegler's total sales

in the lean years of 1981, 1982, 1983 and 1984, respectively. In the same time period, Rexnord equipment accounted for a significantly higher percentage of Ziegler's total sale of aggregate equipment. For the years 1980, 1981 and 1982, Rexnord equipment constituted 95 percent, 83 percent, and 32 percent of this market.

In 1982 and 1983, the Processed Machinery Division of Rexnord lost over $8 million. Rexnord decided it could save money by disbanding the distributor system and selling its products directly. Accordingly it announced in September 1983 that for economic reasons it did not intend to renew any of the 23 distributor contracts it had nationwide when they expired on June 30, 1984, and it intended to go to a direct system of selling with agents.

Ziegler rejected Rexnord's offer to transform Ziegler from a distributor into a "tight agent," and Rexnord refused to renew the distributorship agreement. The legal dispute in this case arose from this disagreement.

We first address whether Rexnord and Ziegler share a community of interest under sec. 135.02 (1), (3) and then address whether Rexnord had good cause to refuse to renew its distributorship agreement with Ziegler.

## II.

The Wisconsin Fair Dealership Law (ch. 135) was enacted to "promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis." Sec. 135.025(2)(a), Stats. 1985–86. Convinced that grantors of dealerships had "inherently

superior economic power and superior bargaining power in the negotiation of dealerships," the legislature attempted in WFDL to "protect dealers against unfair treatment by grantors." Sec. 135.02(2)(b). The result was a statute with "a sharp bite," with significant protections for dealers. *H. Phillips Co. v. Brown-Forman Distillers,* 483 F. Supp. 1289, 1295 (W.D. Wis. 1980). The statute prohibits the grantor from terminating, cancelling, failing to renew or substantially changing the competitive circumstances of a dealership agreement without good cause. Sec. 135.03. If a grantor violates WFDL, a dealer may seek damages and an injunction. Sec. 135.06.

Courts have frequently been called upon to determine whether a business relationship falls within the purview of WFDL.[2] Under sec. 135.02, Stats. 1985–86,[3]

---

[2]One commentator wrote that since the Wisconsin Fair Dealership Law was enacted in 1974, federal and state courts have decided nearly 100 cases under the law, with one of the greatest sources of litigation involving whether a business relationship falls within the meaning of dealership. Note, *Foerster, Inc. v. Atlas Metal Parts—The Wisconsin Supreme Court Takes a Narrow View of the Dealer's Financial Interest Protected by the Wisconsin Fair Dealership Law,* 1985 Wis. L. Rev. 155, 156.

[3]Dealer is defined in sec. 135.02 (2), Stats. 1985–86, as follows:

"(2) 'Dealer' means a person who is a grantee of a dealership situated in this state."

Dealership is defined in sec. 135.02 (3) as:

"(3) 'Dealership' means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise."

a dealership exists if the following elements are satisfied:

> "1.  a contract or agreement between two or more persons;
>
> "2.  by which a person is granted
>     a.  the right to sell goods or services;
>     b.  the right to distribute goods or services; or
>     c.  the right to use a trade name, trade-mark, service mark, logotype, advertising or other commercial symbol, and
>
> "3.  in which there is a community of interest in the business of
>     a.  offering goods or services;
>     b.  selling goods or services; or
>     c.  distributing goods or services at whole-sale, retail, by lease, agreement or otherwise."

*See Kania v. Airborne Freight Corp.,* 99 Wis. 2d 746, 763, 300 N.W.2d 63 (1981).

Much of the difficulty in interpreting the statutory definition of dealership has stemmed, as it does in this case, from the troublesome third element, community of interest, probably the element which most distinguishes dealerships from other forms of business agreements. The community of interest requirement has been difficult to delimit with any precision. As one

---

Community of interest is defined in sec. 135.02 (1) as:

"(1) 'Community of interest' means a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services."

court noted, "the requirement for a 'community of interest' must be interpreted so that it means something. If it is interpreted to mean that anytime a dealer sells any products of a manufacturer there is a community of interest, the requirement would be effectively read out of the statute. For the phrase to mean something, 'community of interest' must indicate some significant economic relationship between the parties." *Kusel Equip. Co. v. Eclipse Packaging Equip. Ltd.*, 647 F. Supp. 80, 82 (E.D. Wis. 1986). The challenge in interpreting community of interest, then, is to establish some guideposts which will confine the phrase without so constricting it that it no longer extends to persons or entities the legislature intended to protect.

The circuit court and the court of appeals in this case appear to have found a guidepost in our decision in *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis. 2d 17, 313 N.W.2d 60 (1981). These courts seem to have assumed that in *Foerster* this court adopted, or at least strongly suggested, the rule that a business must devote 50 percent to 60 percent of its time to the grantor's product or service in order to qualify as a dealer under the statute.[4] Thus, it was not difficult for

---

[4] In *Foerster*, which involved a manufacturer's representative rather than a distributor-wholesaler, this court stated that the termination in that case did "not cause the type of 'economic hardship' which arises where 50% to 60% of the business time is dedicated to the sale of one company," thus intimating in the eyes of several courts and litigants, but not all, that this court was adopting a fixed percentage test, that is, a 50–60%-of-business-time-devoted-to-the-affairs-of-the-grantor test, for determining whether a business was a dealer within the meaning of the Wisconsin Fair Dealership Act. *Foerster, supra* 105 Wis. 2d at 27.

We note that any discussion of the concept of community of interest in *Foerster* was dicta, because both parties agreed in that

the courts below to conclude, upon consideration of the undisputed fact that in no year could more than 8 percent of Ziegler's revenues be attributed to the sale of Rexnord products,[5] that Ziegler did not qualify as a dealer under the statute.

We conclude that the percentage test relied on by the circuit court and the court of appeals in this case will not, in and of itself, necessarily suffice as a guidepost for determining the existence of community of interest. Rather than selecting a fixed percentage test to define a dealership, the legislature selected a definition that articulated the core concept of community of interest.[6] The legislature consciously defined the phrase community of interest to encompass an extraordinarily diverse set of business relationships not limited to the traditional franchise. As this court has said in *Bush v. Nat'l School Studios, Inc.,* 139 Wis. 2d 635, 407 N.W.2d 883 (1987): "[I]n determining whether a dealership exists, courts should not focus solely on identifying the telltale trappings of the tradi-

---

case that there was a community of interest. *Foerster, supra* 105 Wis. 2d at 25.

[5]The court of appeals seemed to rely solely on the percentage of revenue. The circuit court did, however, refer to the fact that "since the nonrenewal of its agreement with Rexnord, Ziegler has not terminated any employees, and in fact increased the number of its employees from 46 to 49 in the period of September 1983 to September 1984."

[6]For a suggestion that the legislature enact numerical limitations on the application of the dealership law, see Note, *Foerster, Inc. v. Atlas Metal Parts—The Wisconsin Supreme Court Takes a Narrow View of the Dealer's Financial Interest Protected by the Wisconsin Fair Dealership Law,* 1985 Wis. L. Rev. 155, 188.

tional franchise."[7] Community of interest, therefore, cannot be reduced to a mathematical equation.

A test for community of interest based exclusively on a fixed percentage of business time or business revenues improperly truncates the court's inquiry into the relationship between the parties, focuses the court's attention on one aspect of the business relationship to the exclusion of all others, and narrows the coverage of the statute in a manner that ill-suits a statutory definition of dealership designed to include a variety of relationships which are not all structured in the same manner. Thus, to the extent that *Foerster* may be interpreted to lay down a rigid, exclusive percentage test to determine continuity of interest, we disavow such an interpretation.

Although we have concluded that a test for community interest based exclusively on a fixed percentage of business time or business revenues is inappropriate, we recognize, as we explain more fully later, that these percentages are important indicators of whether there is a community of interest rendering a business relationship a dealership.

The guideposts that mark a community of interest must be derived from the statutory definitions of community of interest, sec. 135.02(1), and dealership,

[7]While it is often helpful in determining what constitutes a community of interest to refer to the characteristics of traditional franchises, WFDL is not limited to only those business resembling commonly agreed upon franchises. Any statement in *Foerster* which appears to limit the definition of dealership under WFDL to traditional franchises or only small businesses is not in keeping with the legislative intent. *See Foerster,* 105 Wis. 2d at 24. WFDL is not limited to business of any particular size. *Bush, supra* 139 Wis. 2d at 650.

sec. 135.02(3), and the legislatively enumerated purposes and policies of WFDL set forth in sec. 135.025(2).

The statutory definition of community of interest, sec. 135.02(1), speaks of the grantor and grantee having a "continuing financial interest" in their business relationship. This requirement contemplates a shared financial interest in the operation of the dealership or the marketing of a good or service. *Kania, supra* 99 Wis. 2d at 767. Thus one guidepost to determine community of interest may be called "continuing financial interest."

The statute not only defines the phrase "community of interest" in terms of "continuing financial interest" but also uses the phrase community of interest in sec. 135.02(3) to define dealership. As used in the definition of dealership, the phrase community of interest signifies not only a continuing financial interest but also a likeness or similarity of interest in the common business in which the dealer and grantor are engaged. Community of interest connotes shared goals and cooperative, coordinated efforts.[8] Although every contract involves some shared goals and coordinated efforts, more than a modicum of shared goals and cooperation is required to establish a community of interest. As we have said previously, the parties to a dealership must exhibit shared goals and a cooperative effort more significant than in the typical vendor-vendee relationship. In addition, the goals and efforts

---

[8]Black's Law Dictionary provides the following definition of "community of interest" from the distinct but related area of joint ventures: an "interest common to both or all parties, that is, mixture or identity of interest in venture wherein each and all are reciprocally concerned and from which each and all derive material benefit and sustain a mutual responsibility." Black's Law Dictionary (5th ed. 1979).

of the parties must not simply be coextensive, that is, the grantor must not have the degree of control over the dealer that a master (employer) has over a servant (employee). See *Bush, supra.* Thus a second guidepost derived from the statutes to determine community of interest may be called "interdependence," the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship.

Read in light of the legislature's announced purpose in WFDL to "protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships," sec. 135.025(2)(b), "continuing financial interest" and "interdependence" appear to require a person to demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person (thus giving the grantor inherently superior bargaining power). The alleged dealer's economic health is threatened where a termination, cancellation, failure to renew, etc., a business relationship would have a significant economic impact on the alleged dealer.

The two guideposts are closely related aspects of the concept of community of interest. They should assist courts in parsing the facts in an individual case and help sharpen the focus of a court's inquiry into the existence of a community of interest between an alleged grantor and dealer without robbing the concept of community of interest of the flexibility which the legislature intended it to have.

A court must not restrict its inquiry to any one facet of the business relationship, but rather must examine a wide variety of facets, individually and in

their totality, as evidenced in the actual dealing of the parties and in their contract or agreement. Facets which a court should examine to determine whether the grantor and grantee have a continuing financial interest in the business relationship and whether the business relationship is so interdependent that there is a community of interest include: how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services. Each of the facets may relate to one or both of the guideposts and we do not intend this list to be all inclusive.

In the case at hand, we examine the facets of the business relationship between Ziegler and Rexnord (as well as we can on the basis of this record at the summary judgment stage) in light of the two guideposts for determining community of interest: continu-

ing financial interest and interdependence. Our task is to determine whether we can say as a matter of law that Ziegler and Rexnord either share or do not share a community of interest.

The parties' central dispute relates to the continuing financial interest guidepost. The parties dispute whether Ziegler has a sufficient financial interest in its Rexnord distributorship to fall within the statutory requirement of community of interest. We recognize that the sale of Rexnord products accounted for only a small percentage of Ziegler's total revenues: between 1 percent and 8 percent.[9] A low percentage is strong evidence, evidence that might ultimately be determinative in many cases, that there is no continuing financial interest between the parties in the operation of the business and thus no community of interest. Nevertheless, this court should examine other facets of the business relationship that might bear on the question of whether Ziegler has a continuing financial interest in the distributorship.

A continuing financial interest in the distributorship may be exhibited in this case, for example, by

---

[9]Ziegler argues that this court should consider, for the purpose of determining whether a community of interest exists, the percentage of aggregate equipment sales, rather than the percentage of total sales, for which its sales of Rexnord equipment accounted. Rexnord responds that aggregate equipment does not constitute a "separate" market and thus that percentage total sales is the proper figure for the court to consider.

We are puzzled by the arguments of the parties. First, we note that Ziegler's argument raises the particularly troubling spectre of manipulation of market definition to fit the facts in a case. Any product or service can probably be described particularly enough to constitute a separate market. Second, neither Ziegler nor Rexnord relates the issue of proper market definition to the text or purpose of WFDL.

Ziegler's financial investment in the inventory, facilities and good will of the alleged dealership. We note that Ziegler asserts that it expended large sums to insure that it would have adequate facilities for marketing Rexnord products.[10]

In 1980, Ziegler purchased a 10,000 square foot building in Milwaukee at a cost of approximately $211,000. In 1979, Ziegler Company spent $1,240,000 to construct a building in Eau Claire. Relying on two affidavits, Ziegler asserts that the primary purpose of the Milwaukee purchase was to provide a facility for the warehousing of spare parts for Rexnord equipment. Ziegler claims that the Eau Claire building was specifically designed to accommodate the servicing of large Rexnord aggregate equipment, although Ziegler serviced other accounts besides Rexnord from the Eau Claire building, and that it would not have constructed the building if it had known Rexnord was not going to renew its dealership agreement.

Rexnord asserts that the acquisition and construction preceded the distributorship agreement, that the written agreement does not require the acquisition or construction of any buildings[11] and that, according to a

[10]As this court says in *Bush,* "A substantial investment is one way to satisfy the 'community of interest' requirement." *Bush, supra* 139 Wis. 2d at 655. It is not the only way.

[11]Rexnord argues, however, that the written distributorship agreement did not require Ziegler to construct or acquire any building and that the integration clause in the distributorship agreement bars the introduction of any evidence that Rexnord induced Ziegler to purchase and construct warehousing facilities as a prerequisite to the granting of the distributorship. Rexnord cites *In re Spring Valley Meats, Inc.,* 94 Wis. 2d 600, 606–08, 288 N.W.2d 852 (1980), a case holding that an integration clause, in conjunction with the parole evidence rule, bars the introduction of

deposition, Ziegler's acquisition or construction of both facilities was not attributable to the Rexnord relationship. Moreover Rexnord asserts that Ziegler's factual contention that Ziegler purchased and constructed capital improvements worth nearly $1,500,000 for Rexnord's business is incredible as a matter of law considering the relatively small income Ziegler derived from Rexnord's equipment.

The parties disagree regarding the purpose of Ziegler's acquisition or construction of buildings in Milwaukee and Eau Claire and the significance of this investment. Ziegler claims that these investments in facilities constitute a continuing financial interest in Rexnord's distributorship. If Ziegler did in fact make these investments in facilities relying on Rexnord, then Rexnord's nonrenewal may well have a significant impact on Ziegler's economic condition. Thus, Ziegler's financial investment in facilities becomes a material fact in dispute in this case bearing on the issue of community of interest.

We must examine the evidence to determine interdependence, to determine whether Ziegler's and

---

extrinsic evidence to vary or contradict the terms of a writing. The evidence is not offered in this case, however, to vary, contradict or even assist in the interpretation of a written document in this case. Instead, the court is attempting to determine whether the acquisition or construction is attributable to the relationship and whether Ziegler and Rexnord shared a community of interest within the meaning of the WFDL. We conclude that the integration clause cannot operate to bar evidence bearing on the issue of whether a community of interest exists. The court determines the existence of a dealership by looking at the language of the written agreement and the manner in which the parties operated under the agreement. As the court points out in *Bush,* "we must consider the actual duties and responsibilities of each party" in order to determine whether a community of interest exists. *Bush, supra* 139 Wis. 2d at 653.

Rexnord's efforts in their business relationship were more coordinated and interrelated than a typical vendor-vendee relationship.

Several factors (most of which are set forth in the written agreement) indicate a level of interdependence:[12] Ziegler has primary responsibility for the sale of Rexnord products in Wisconsin; Ziegler must use its best efforts to promote the sale of Rexnord products; Rexnord and Ziegler together are to set sales targets; Ziegler is required to provide start-up and warranty service for Rexnord products delivered by Ziegler or by Rexnord at Ziegler's request; Ziegler is required to maintain inventories of spare parts sufficient in the opinion of Rexnord to satisfy the needs of Wisconsin customers; Ziegler must provide a suitable place of business and sufficient personnel in connection with the sale and servicing of Rexnord products;[13] Ziegler must provide various reports and items of information to Rexnord;[14] and finally Rexnord may periodically review Ziegler's performance under the distributorship agreement to ascertain whether Ziegler is performing satisfactorily.

Ziegler is not entitled to make as much use of Rexnord's trademarks and trade names as some dealers are. Ziegler may not identify itself in general with Rexnord's trademarks or trade names, but it may

---

[12]Several factors relate to continuing financial interest as well as interdependence.

[13]Specifically, Ziegler must provide at least one fulltime aggregate specialist, one fulltime replacement parts manager and one fulltime serviceman who has been certified by Rexnord.

[14]Ziegler must provide information and reports for production planning and replacement parts service efficiency, a complete mailing list of customers in Wisconsin, market reports on Wisconsin, and financial information on Ziegler's business.

employ them in conjunction with the solicitation and sale of Rexnord products.

On the other hand, the distributorship agreement, an important though not conclusive source of information about the business relationship, itself states the purpose of the agreement in a way that could be construed so as to intimate that Ziegler's and Rexnord's relationship exhibits a significant level of interdependence. "The success of the Distributor [Ziegler] and Rexnord is dependent upon the continuing goodwill on the part of customers toward Rexnord products and policies. In order to promote this goodwill, both the Distributor and Rexnord undertake to assume certain responsibilities. ... The Distributor, in turn, performs important marketing functions. It does so through investment of its capital in inventory, receivables and facilities for warehousing and displaying machinery for sale and by application of its efforts and experience in merchandising and selling the products authorized hereunder."

Finally, the duration of the relationship bears on the extent of interdependence in the business relationship. Although the parties agree on the historical facts of their relationship (which were stated previously), they disagree about the factual inferences and the legal conclusions to be drawn therefrom. While Rexnord views the relationship beginning in 1978, Ziegler claims a long relationship dating back to the 1920's. Thus, the duration of the relationship is a disputed issue insofar as it relates to the extent of interdependence and thus community of interest.

We conclude that the circuit court and court of appeals erred by not examining all facets of the business relationship to determine community of

611

interest. This court has examined the record at this summary judgment stage. Because material issues of fact remain in dispute this court cannot resolve, as a matter of law, the question whether the community of interest requirement has been met.

## III.

We recognize that the issue of good cause for nonrenewal raised by Ziegler's summary judgment motion, just like the dealership issue raised by Rexnord's summary judgment motion, may be determinative of the litigation. Nevertheless, we do not reach the good cause issue.

The good cause issue includes Rexnord's challenge to the constitutionality of the statute. Rexnord asserts the statute is unconstitutional if the court should interpret good cause as excluding consideration of economic hardship to the grantor. Generally, the court will not decide constitutional questions if the case can be resolved on other grounds. *Labor and Farm Party v. Election Board,* 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984). Because the circuit court might determine that Ziegler is not a dealer within the meaning of WFDL, we might not have to address this issue in the case.

Furthermore, the attorney general has not been notified of the constitutional challenge. While failure to notify the attorney general does not necessarily preclude review of a constitutional issue, this court may decide not to hear a constitutional challenge to a statute when notice has not been given to the attorney general. The central purpose of notifying the attorney general is to afford the attorney general the opportunity to act in a representative capacity in behalf of the

legislature and the people of the state to uphold the constitutionality of a statute of statewide application. *In the Matter of Fessler,* 100 Wis. 2d 437, 442, 302 N.W.2d 414 (1981). We conclude that before we interpret WFDL and decide the constitutionality of this important act which sets forth this state's legislative policy on dealerships and affects so many people in the state, we should give the attorney general an opportunity to participate in the proceedings. For these reasons, we conclude that we should not reach the good cause issue.

For the reasons set forth, we reverse the decision of the court of appeals and the judgment of the circuit court and remand the cause to the circuit court for further proceedings not inconsistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed; the judgment of the circuit court is reversed and the cause is remanded.