**TEAM ELECTRONICS OF JANESVILLE, INC.,
Plaintiff,**

v.

**APPLE COMPUTER, INC., Defendant.**

No. 91–C–238–S.

United States District Court,
W.D. Wisconsin.

Sept. 24, 1991.

Robert G. Krohn, of Nowlan & Mouat, Janesville, Wis., for plaintiff.

David R. Cross of Quarles & Brady, Milwaukee, Wis., for defendant.

## SUPPLEMENTAL MEMORANDUM

SHABAZ, District Judge.

Plaintiff's claim, based upon the Wisconsin Fair Dealership Law, was tried to the Court on Thursday, September 12, 1991. At the conclusion of the trial the Court announced from the bench its findings of fact and conclusions of law and, pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure, incorporated the findings previously made by the Court at the conclusion of the preliminary injunction hearing held on April 4 and 5, 1991. The Court concluded and held that the agreement between the parties concerning distribution of Apple computers to education customers was separate and distinct from the agreement permitting the plaintiff to resell Apple computers in the general retail market. The Court further concluded that there was no community of interest in plaintiff's business of selling computers in the education market, and, consequently, no dealership relating to the education agreements. The Court reserved the right to supplement its oral findings of fact and conclusions of law in a written supplemental memorandum and now issues such a supplemental memorandum.

The purpose of this memorandum is to more fully set forth conclusions of law concerning the scope of the agreement to be considered in the dealership analysis. The Court also expands upon its legal conclusion that plaintiff's investment in good will does not establish a continuing financial interest sufficient to support a dealership.

*Defining the Scope of the Agreement*

■ Section 135.02(3), Wis. Stat., defines a dealership as "a contract or agreement" which grants the right to sell or distribute goods or services and "in which there is a community of interest in the business of" offering or selling such goods or services. Where several written contracts govern the relationship of the parties it may be a difficult task to determine whether the relationship should be viewed as a single "agreement" or several distinct agreements. As this Court held in its decision of July 29, 1991, the scope of a "contract or agreement" cannot be determined merely by counting documents, but requires consideration of the substance of the contractual relationship.

■ In assessing the substance of the relationship for purposes of determining the scope of the agreement to be considered under the dealership definition the Court considers the following factors to be useful guidelines:

(1) the language and history of the agreements;

(2) the extent of distinction between the activities;

(3) the extent to which the activities identified in the contracts are treated distinctly by the defendant in the operation of the plaintiff's businesses; and

(4) whether there are third parties performing the activities separately.

*1. Language and History of the Agreements*

The 1990 agreements clearly describe two separate activities. Although the agreements have been drafted by the grantor and are therefore not dispositive of the separateness of the activities, neverthe-less they are one indication that the parties viewed the activities as distinct undertakings. The history of the agreements is that the parties operated under a single agreement covering all customer markets from 1979 to 1983. In 1983 a clear change was made concerning sales to the education market. At that time the defendant began selling computers directly to the education market and paying a commission to the plaintiff. The result of this change was to shift the pricing decisions, the burden of maintaining inventory, the risk of nonpayment and the burden of processing billing and collections from the plaintiff to the defendant.

Between 1984 and 1989 the agreements required that in order to operate as an education consultant plaintiff must also be an authorized seller at retail. In 1990 this requirement was removed and the two contracts became entirely independent of one another. By 1991 the standard form reseller contract precluded a reseller from selling from inventory in the education market.

Thus, the form and history of the agreements discloses that the relationship of the parties was, prior to 1983, almost certainly a single agreement for purposes of dealership analysis but that the parties' treatment of the retail and educational aspects of the business diverged sharply in 1983 and continued to diverge through 1990. The fact that the parties once had a single unified agreement weighs in favor of finding a single dealership. However, the substantial history of separation of the agreements supports the view that the agreements should be viewed separately for purposes of dealership analysis.

*2. Extent of Distinction between the Activities*

If a manufacturer or supplier organizes and divides its own operations around the activities which are the subject of separate agreements, this is strong evidence that the agreements should be viewed separately. For example, if separate corporate divisions are dedicated to separate products or markets, contracts governing those products or markets are more likely to be dis-

tinct. In contrast, where the supplier uses the same employees, facilities and strategies for different products or markets it is more likely that the relationship between the parties should be viewed as a single agreement.

Testimony at trial made it clear that the changes in 1983, as well as the subsequent changes, were a reaction to increasing competitiveness in the sale of computers to the education market which has intensified in recent years. The defendant has dedicated substantial staff solely to the purpose of reorganizing and analyzing the method of the delivery of its products to the education market. The testimony of the defendant's officer established that defendant believes that the purchasing decisions of education institutions require a substantially different marketing approach, as well as a substantially different level of support. The testimony further established that the defendant considers and approaches the two markets separately and that the agreements reflect this internal view.

The real distinction in the defendant's corporate organization and approach to the education market supports the conclusion that the agreements should be examined separately for purposes of dealership analysis. Where there is evidence of such internal division it overcomes any inference that the form of the agreements is merely an attempt by the defendant to deprive the plaintiff of dealership rights.

### 3. Extent of the Distinction Between the Activities in the Grantee's Business

Plaintiff's internal treatment of the activities in its business operations also tends to define the nature of the underlying agreement. If the plaintiff uses the same inventory, facilities, employees and business plan for both activities, this strongly evidences a single "agreement" and "business" for WFDL purposes. In contrast, where there is little overlap in these areas this factor points to separate "agreements" and "businesses."

The trial testimony revealed that there was almost no overlap by plaintiff in the use of employees, fixed facilities, inventory or expenses between the reseller activities and the education marketing activities. Plaintiff's president testified that almost all conventional advertising was directed at the retail market, it being essentially ineffective in the education market. Plaintiff's expert, relying upon the assertions of plaintiff's officers concluded that the cost of generating the 9 percent STO fee was less than 18 percent of that fee. Essentially, the only expenses allocated to the educational activity was the salary and expenses of the single employee dedicated fully to servicing those customers. Although plaintiff's president testified that substantial portions of the other employees' time were devoted to education customers, this testimony is belied by the evidence that none of these employees were released upon the termination of the education consulting agreement and that all of these employees remain fully employed in the retail aspects of the business. It is also clear that none of the plaintiff's inventory was required in support of its education sales activities. In short, plaintiff treated the education sales business as a commissioned arrangement entirely separate from its retail sales and generated its income in that area almost exclusively through the efforts of a single dedicated sales person.

This factor is highly persuasive of the conclusion that the education consultant agreement was distinct and separate from the reseller agreement and that it should be considered separately for purposes of determining whether a community of interests exists.

### 4. Separation of Function for Other Grantees

Prior to 1989 it was very rare for a grantee of the defendant to conduct business only as a reseller or only as an education dealer. By 1990, however, there were at least two Wisconsin grantees operating exclusively as education consultants. It is the defendant's intent, as evidenced by the circumstances of this lawsuit, to encourage and require more such separate treatment in the future. This tends to establish that the division of the contracts

is a real, substantive difference, and not merely a formal one.

A consideration of these four factors leads to the conclusion that the agreements represented distinct businesses requiring different approaches, different employees and different resources. Accordingly, there is not a single "agreement" within the meaning of the WFDL, but rather separate agreements relating to separate businesses, each of which must be supported by a community of interest if it is to come within the coverage of the Wisconsin Fair Dealership Law.

*Continuing Financial Interest*

■ The principal requirement for a community of interest between the parties is a continuing financial interest. § 135.-02(1), Wis.Stat., *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis.2d 593, 607–608, 407 N.W.2d 873 (1987). One of the keys to a continuing financial interest is some type of investment by the grantor which will be lost in the event of termination. *Moore v. Tandy Corp.*, 819 F.2d 820, 824 (7th Cir. 1987). It is virtually undisputed that in connection with the education consultant agreement plaintiff made no investment in advertising, inventory or facilities. However, plaintiff asserts that its investment in good will is sufficient to support a dealership. The facts do not support the conclusion that plaintiff's investment in "goodwill" constitutes a sufficient unrecoverable investment.

The Court affirms its previous conclusion that the relationship between plaintiff and defendant in connection with the education agreements was little more than a typical vendor-vendee relationship not afforded coverage by the WFDL. *Kania v. Airborne Freight Corp*, 99 Wis.2d 746, 769, 300 N.W.2d 63 (1981). The demand for defendant's products in the education market was largely a result of defendant's monopoly position in that market in the early 1980's. Similarly, present demand is partly a result of heavy front end investment by schools in defendant's products which translates to the desire to purchase additional products. The evidence at trial supporting the notion that purchases from the plaintiff were the result of unique goodwill attributable to the plaintiff was very weak. In fact, it is clear that there was substantial dissatisfaction among plaintiff's customers. The type of goodwill attributable to the plaintiff in the education market is that goodwill generally generated by a manufacturer's representative.

Neither is the Court persuaded by evidence that the plaintiff's stock sold for an amount substantially above the book value of its assets in 1983. There was no evidence to show the fair market value of corporate assets in 1983. There was no cash investment by the plaintiff to acquire this goodwill. The difference between the book value of assets and the sale price of stock is "goodwill" only in the broadest accounting sense and does not demonstrate the type of up-front investment required for WFDL protection.

Under the circumstances of this case the Court agrees with the reasoning of *Aida Engineering, Inc. v. Red Stag, Inc.*, 629 F.Supp. 1121, 1126 (E.D.Wis.1986):

> While it may not, therefore, be possible to produce a definitive list of the kinds of investment that are protected by the WFDL, neither goodwill, produced merely by the duration of a representative's relationship with customers, nor reliance, in the form of a sales strategy to represent certain manufacturers and not others, qualify by themselves.

(Citations omitted.) Accordingly, the Court concludes the plaintiff's investment in "goodwill" was not of a type or in a sufficient amount to support a finding that it had a sufficient continuing financial interest in the business to qualify it for the protections of the Wisconsin Fair Dealership Law.

Accordingly,

### ORDER

IT IS ORDERED that the findings of fact and conclusions of law announced by the Court are supplemented by the comments contained herein.

IT IS FURTHER ORDERED that judgment is entered in favor of the defendant

**158**

DISMISSING plaintiff's complaint and all claims contained therein with prejudice and costs.