CAJAN OF WISCONSIN, INC., d/b/a
Awe Ski & Patio, Plaintiff,

v.

WINSTON FURNITURE COMPANY,
INC., Defendant.

Civ. A. No. 90–C–946.

United States District Court,
E.D. Wisconsin.

April 6, 1993.

John E. Machulak, Susan R. Robertson, Machulak, Hutchinson, Robertson, Dwyer & O'Dess, Milwaukee, WI, for plaintiff.

Mark E. Sostarich, Godfrey & Kahn, Milwaukee, WI, and Richard Freese of Burr & Forman, Birmingham, AL, for defendant.

## DECISION AND ORDER

REYNOLDS, Senior District Judge.

In this action, removed to this court from the Milwaukee County Circuit Court on October 1, 1991, plaintiff Cajan of Wisconsin, Inc., d/b/a Awe Ski & Patio ("Cajan") claims defendant Winston Furniture Company, Inc. ("Winston"), terminated its dealership relationship with Cajan without proper notice and without good cause, in violation of the Wisconsin Fair Dealership Law, Wis.Stat. § 135.01 *et seq.* On September 4, 1991, Winston filed a motion for summary judgment. For reasons stated below, the motion is granted.

Jurisdiction in this court is based upon 28 U.S.C. § 1332. Cajan is a Wisconsin corporation with its principal place of business in Wisconsin. Winston is a Delaware corporation with its principal place of business in Alabama. There is an amount in controversy in excess of $50,000.

## FACTS [1]

Cajan is a retail seller of ski equipment and outdoor furniture, with four stores in the

---

1. What follows is taken from the parties' statements of fact and supporting materials.

Milwaukee area. In September 1986, at a trade show in Chicago, Cajan president William Awe ("Awe") purchased $10,000 to $12,000 of Winston furniture, placing the order with Winston sales representative Susan Arnold ("Arnold"), who had shown Awe the Winston line and its "Confidential Dealer Net Price List." The list included the retail price, the "non-stock dealer" price, and the "stock dealer" price of various kinds of Winston furniture. (Cajan Ex. 3.) The stock dealer price, the lowest of the three, was given to "retail operation[s] that normally [order] in car and/or truckloads, prominently [merchandise] Winston's products on retail floor, and [maintain] some warehouse stock." (Winston Ex. C.) Because of the volume of its purchase, Cajan was given the stock dealer discount.

Cajan continued to purchase and sell Winston furniture for the next four years. Cajan's purchases from Winston totaled $16,618.50 in the 1986–87 furniture season, $19,880 in the 1987–88 season, $30,000 in the 1988–89 season, and $77,122.77 in the 1989–90 season.[2] (Nov. 6, 1991 William Awe Aff. at ¶ 18.) At their high point, in 1990, sales of Winston furniture accounted for a fourth of Cajan's furniture sales, or 16.5 percent of its total sales; those percentages were lower in previous years. (Winston Statement of Facts at 5; Awe Aff. at ¶ 18.) In its displays of Winston furniture, Cajan used Winston brochures, catalogs, banners, and fabric swatches that Winston supplied at no charge. The Winston name was featured in Cajan's radio advertising, which ran sixteen weeks out of the year at a cost of $2,000 a week. (Awe Aff. at ¶ 14.) Winston furniture was prominently displayed in Cajan's retail space. Awe estimates that at the peak of the outdoor furniture season, about 45 percent of Cajan's retail space and 45 percent of its sales time was devoted to Winston furniture. (Awe Aff. at ¶ 15.)

Winston exercised no direct control over the way Cajan did business. Winston did not require Cajan to purchase any minimum quantity of furniture (although the stock dealer discount was conditioned on a minimum purchase). Winston imposed upon Cajan no sales quotas or other performance standards. Nor did Winston require Cajan to continue selling Winston furniture for any minimum period of time. Winston had no contractual right to dictate how Cajan would display, promote, price, or service the furniture it purchased, although, as discussed below, Winston took Cajan's sales approach into account in deciding whether to accept purchase orders from Cajan in the future.

There were the following restrictions on the quantity and type of Winston furniture Cajan could purchase. First, because Cajan was not approved for credit, Winston refused to accept purchase orders beyond the amount of Cajan's letter of credit, unless the orders were prepaid. Second, Arnold's policy was not to accept orders for identical furniture from competing retailers; thus, if one retailer was already selling furniture of a certain frame style, fabric, and color, another retailer in the same area would need to alter one or more of those variables in its purchase order. (July 11, 1991 Susan Arnold Dep. at 107.) That policy presented no real problems in Cajan's case. (*Id.* at 108.)

With the possible exception of the policy concerning identical furniture, the relationship between Winston and Cajan was in no sense exclusive. Winston sold its furniture to a number of Cajan's competitors in the Milwaukee area. Likewise, Cajan was permitted to sell, and did sell, products from a variety of Winston's competitors, and no Cajan salesperson was exclusively devoted to the Winston line. Cajan was not obligated to use its best efforts in promoting Winston products.

Each summer, Cajan set up a display of Winston furniture at the State Fair Park in Milwaukee. Arnold first asked about the display in June 1987, after the initial shipment of Winston furniture was made. (Arnold Dep. at 48.) At that point, Arnold's understanding was that the display would be a single, rather than permanent, event, and that most of the furniture would be sold from Cajan's store. (*Id.*) Subsequently, however, Arnold learned from Cajan's competitors that

---

2. The outdoor furniture season apparently runs from August, when initial wholesale orders are placed, through the end of the next summer, when most retail sales are made.

the display was to be permanent. (*Id.* at 50.) The competitors were concerned, according to Arnold, that the fairground display devalued the Winston furniture, which was generally marketed as medium- to high-quality stuff. (*Id.* at 51). When Arnold told Awe that she felt the fairground was an inappropriate display site, Awe explained that he could not sell Winston furniture at a profitable volume without using the fairground display. (*Id.* at 52; Awe Aff. at ¶ 17.) The matter was left at that.

About a year later, in the middle of the summer of 1988, Arnold actually saw the fairground site for the first time. She found, she says, that it looked "like a barn," containing very little furniture. (Arnold Dep. at 61.) Once again, Arnold expressed her misgivings about the display to Awe, who attributed the state of the display to the fact that the furniture season was nearing its end. (*Id.* at 62.) Arnold says she accepted that explanation. (*Id.*)

In September 1989, Bruce Erickson ("Erickson"), who had been hired by Arnold to deal with Wisconsin sales accounts, asked Awe about his plan for the next summer's fairground display. (Arnold Dep. at 77.) Awe informed Erickson that he planned to make the display "more attractive" and to "accessorize it." (*Id.*; Awe Aff. at ¶ 17.) Cajan did so, in its view, by placing its Winston furniture displays on brick and cobblestone patios. (Awe Aff. at ¶ 17.) That solution, however, apparently did not satisfy Arnold. In May and June 1990, she conveyed to Steve Hess ("Hess"), a Winston sales manager, her concern that Cajan's sales approach was devaluing the Winston name in Milwaukee. (Arnold Dep. at 32.) Hess advised Arnold that if she "terminated" Cajan, it should happen on August 1, the end of the selling season and the date upon which Cajan's existing letter of credit would expire. (*Id.* at 33.)

On August 1, 1990, Arnold sent Awe a letter informing him, without prior notice, that "effective immediately" Winston would accept no more purchase orders from Cajan. (Nov. 6, 1991 John Machulak Aff., Ex. 4.) The letter gave no specific reason for the decision, but described it as "final and per-manent and not open for discussion." (*Id.*) Arnold says the decision was based upon her concern about Cajan's fairground display. (Arnold Dep. at 31.) Awe was never informed, however, that his continued use of the display might result in termination of the parties' business relationship. (*Id.* at 80.) Cajan says it was badly hurt as a result of the termination, both in terms of unrealized sales amounting to perhaps $200,000, and in terms of damage to its reputation. (Awe Aff. at ¶ 19.) There is no indication, however, that the loss of Winston's business actually threatened Cajan's existence.

Aside from production orders and invoices, there were no written agreements between Winston and Cajan.

## ANALYSIS

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

The Wisconsin Fair Dealership Law prevents the grantor of a dealership from terminating the dealership without good cause and ninety days' notice. Wis.Stat.Ann. §§ 135.03, 135.04 (1989). The law defines "dealership" as an "agreement ... by which a person is granted the right to sell or distribute goods or services ... in which there is a community of interest in the business of offering, selling or distributing goods or services." Wis.Stat. Ann. § 135.02(3) (1989). "Community of interest," the critical factor distinguishing a dealership from a vendor-vendee relationship, "means a continuing financial interest between the grantor and grantee in either the operation of the dealership business or

the marketing of such goods or services." Wis.Stat.Ann. § 135.02(1) (1989).

In addition to the element of continuing financial interest, which would seem to arise in most ongoing vendor-vendee relationships, a dealership depends on the presence of "shared goals and cooperative, coordinated efforts." *Ziegler Co. v. Rexnord, Inc.*, 139 Wis.2d 593, 604, 407 N.W.2d 873 (1987). Also important is the notion of "interdependence," which is found to arise where the putative dealer invests heavily as a result of the relationship and stakes its economic health on continuation of the relationship. *Id.* at 605–06.

In this case, the extent of Cajan's financial interest in Winston's business was significant, but not so significant as to indicate, by itself, the existence of a dealership agreement. It is undisputed that, at most, less than a fifth of Cajan's sales revenue was derived from Winston products. Further, although Cajan devoted a considerable amount of sales time, retail space, and advertising for Winston products during certain periods of the year, there is no indication that these efforts consumed a significant percentage of Cajan's total *yearly* resources. Finally, the harm Cajan suffered as a result of Winston's decision has been described only in the vaguest terms, suggesting that the decision did not seriously jeopardize Cajan's economic health.

But far more telling than these financial considerations is the utter absence of any "shared goals" or "cooperative, coordinated efforts" between Winston and Cajan. It is undisputed that Winston never had, and never insisted upon having, any real input into the way Cajan ran its business; Cajan unilaterally decided how it would price, display, promote, and service the Winston products. Although Arnold annually expressed concerns about Cajan's use of the fairground display, there was never any suggestion that Cajan was obligated to take those concerns into account, and, indeed, they were not taken into account until just before the end of the parties' relationship. Under these circumstances, the court concludes that there cannot have been a community of interest between Winston and Cajan sufficient to give rise to a dealership relationship.

As the facts supporting this conclusion are not in dispute, the court must enter summary judgment for defendants.

**IT IS THEREFORE ORDERED** that the September 4, 1991 motion for summary judgment filed by defendant Winston Furniture Company, Inc., is GRANTED and this action DISMISSED.