21 F.3d 430
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 CAJAN OF WISCONSIN, INC., d/b/a Awe Ski & Patio, Plaintiff-Appellant,
v.
WINSTON FURNITURE COMPANY, INC., Defendant-Appellee.
 No. 93-2136.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 8, 1993.
Decided March 28, 1994.
 
 1
 Before POSNER, Chief Judge, KANNE, Circuit Judge, and PHILIP G. REINHARD, District Judge*.
 
 ORDER
 
 2
 Cajan of Wisconsin, Inc., doing business as Awe Ski & Patio ("Cajan"), is a retail seller of two distinct product lines: (1) ski equipment and apparel; and (2) outdoor patio furniture. Winston Furniture Company ("Winston") is a manufacturer of casual outdoor furniture.
 
 
 3
 In 1986, Cajan's president, William Awe, attended an annual trade show in Chicago where the Winston furniture line was being displayed. Awe spoke with Susan Arnold, Winston's sales representative for Illinois and Wisconsin,[1] and, after being shown Winston's "Confidential Dealer Net Price List," placed an order for between $10,000 and $12,000 of Winston furniture.
 
 
 4
 Cajan continued to purchase and sell Winston furniture following the trade show. Cajan's purchases totaled $16,618.50 during the 1986-87 furniture season, $19,880 during the 1987-88 furniture season, $30,000 during the 1988-89 furniture season, and $77,122.77 during the 1989-90 furniture season. At its high point, 16.5% of Cajan's total annual sales were accounted for by sales of Winston furniture, although they represented between 25% and 30% of Cajan's outdoor furniture sales.
 
 
 5
 Cajan, in addition to displaying the Winston furniture line at its retail establishment, also rented space for a special display at State Fair Park in Milwaukee. This display, however, proved to be the downfall of its relationship with Winston. On various occasions, Arnold expressed concern over the quality of the Fair Park display. Responding to Arnold's concerns, Cajan installed a brick and cobblestone patio which it believed would make the display more attractive. Still unsatisfied, Arnold informed Cajan, in a letter dated August 1, 1990, that Winston would no longer accept any furniture orders from Cajan.
 
 
 6
 Cajan then filed this suit in the Milwaukee County Circuit Court, alleging that Winston terminated its dealership without proper notice and without good cause in violation of the Wisconsin Fair Dealership Law ("WFDL"). Wis.Stat.Ann. Sec. 135.01 et seq. (West 1993). Winston removed this case to federal court based on diversity of citizenship. The district court granted summary judgment in favor of Winston, finding that Winston and Cajan did not share a "community of interest" and did not have a dealership relationship within the meaning of the WFDL. Cajan of Wisconsin, Inc. v. Winston Furniture Co., 817 F.Supp. 778 (E.D.Wis.1993). Cajan now appeals.
 
 Standard of Review
 
 7
 Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). In order to survive a motion for summary judgment, the plaintiff must present enough evidence from which "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." Id. at 252.
 
 
 8
 We review de novo a district court's grant of summary judgment, viewing the record in the light most favorable to the non-moving party. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir.1992).
 
 Discussion
 
 9
 The sole issue presented for our review is whether Cajan and Winston shared a "community of interest" within the meaning of the WFDL, thus triggering the act's provisions. Under the WFDL, a "grantor" may not cancel a "dealership" without good cause and ninety days notice. Wis.Stat.Ann. Sec. 135.03; Sec. 135.04 (West 1993). The term "dealership" is defined in the law as an "agreement ... by which a person is granted the right to sell or distribute goods or services ... in which there is a community of interest in the business of offering, selling or distributing goods or services...." Id. at Sec. 135.02 (emphasis added).
 
 
 10
 The "community of interest" requirement is the key factor in determining whether a particular business relationship amounts to a dealership under the WFDL. In interpreting that requirement, the Wisconsin Supreme Court has developed two "guideposts." Ziegler Co. v. Rexnord, Inc., 407 N.W.2d 873 (Wis.1987). The first "guidepost" concerns whether the parties have a "shared financial interest in the operation of the dealership or the marketing of a good or service" or a so-called "continuing financial interest." Id. at 878 (citation omitted). The second "guidepost" concerns "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." Id. at 879. In other words, it concerns the degree of "interdependence" the parties share. Together, these two guideposts "require a person to demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person (thus giving the grantor inherently superior bargaining power)." Id.
 
 
 11
 The Wisconsin Supreme Court has identified ten factors[2] courts should consider in determining whether the parties share a "community of interest." They are (1) "how long the parties have dealt with each other; (2) the extent and nature of the obligations imposed on the parties in the contract or agreement between them; (3) what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; (4) what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; (5) the extent and nature of the alleged grantor's grant of territory to the alleged dealer; (6) the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); (7) the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; (8) the personnel which the alleged dealer devotes to the alleged dealership; (9) how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; (10) the extent and nature of any supplemental services provided by the alleged dealer to consumers of the alleged grantor's products or services." Id. at 879-880.
 
 
 12
 We shall examine each of the Ziegler factors in turn.
 
 Length of Dealings
 
 13
 Cajan purchased furniture from Winston for only four seasons. While not an insignificant amount of time, the parties clearly did not have the kind of long-term relationship, the severing of which might cause severe damage to business expectations.
 
 Obligations Imposed on the Parties
 
 14
 The "agreement" between Winston and Cajan imposed virtually no obligations on Cajan. Despite its contentions to the contrary, Cajan was not required to purchase a minimum amount of Winston furniture or maintain a certain level of inventory. Winston did have a sales program whereby a "stocking dealer" was entitled to a volume discount. However, it is undisputed that Winston would sell furniture, at a higher price, to retailers who wanted to purchase smaller quantities than those required for "stocking dealers."
 
 
 15
 Moreover, Cajan was not required to use its "best efforts" to sell Winston furniture. Winston never set a sales quota for Cajan. Nor was Cajan required to sell the Winston line for any specified period of time. In fact, the only obligation imposed on Cajan was to pay for the furniture it purchased.
 
 Percentage of Time
 
 16
 There is no evidence in the record that Cajan devoted a significant amount of sales time to the Winston line. Awe testified that Cajan devoted approximately 45% of its sales time at its North Avenue store,[3] during the outdoor furniture season, to Winston furniture. However, Awe did not indicate what percentage of Cajan's yearly sales time was devoted to Winston furniture.
 
 Percentage of Gross Proceeds
 
 17
 At its high point in 1990, Winston furniture sales accounted for only 16.5% of Cajan's total revenues. Cajan argues, however, that we should not focus on its total revenues, but should focus on the fact that between 25% and 33% of its outdoor furniture sales were accounted for by Winston furniture sales. However, the Ziegler factors must be applied as they relate to Cajan's business as a whole, not just to its outdoor furniture business. See Kayser Ford, Inc. v. Northern Rebuilders, Inc., 760 F.Supp. 749 (W.D.Wis.1991) (finding that the Ziegler factors should be applied to a business as a whole, rather than to each separate division of the business). Thus, Cajan was not so dependent on sales of Winston furniture to threaten Cajan's economic health as a whole.
 
 Grant of Territory
 
 18
 It is undisputed that Cajan was not the exclusive retailer of Winston furniture in the Milwaukee area. During the period between 1986 and 1990 at least four other Milwaukee area retailers carried the Winston furniture line. Although Winston had a policy of not selling identical furniture to competing retail stores,[4] Winston never refused to make a sale to Cajan on that basis. Winston's failure to give Cajan an exclusive territory is a factor weighing against finding a "community of interest" under the WFDL. See C.L. Thompson Co. v. Festo Corp., 708 F.Supp. 221, 226 (E.D.Wis.1989) (finding that no dealership existed under the WFDL, in part, because the alleged grantor did not grant the alleged dealer an exclusive territory).
 
 Use of Trademarks and Logos
 
 19
 Winston specifically allowed Cajan to use its logo in advertising and promotion material. In fact, Winston provided Cajan with "advertising slicks," brochures, catalogs, fabric swatches, and banners at no charge. Many of these items contained the Winston name and logo. Cajan did not use the "advertising slicks," but it used the Winston name in its radio advertisements. It also used the brochures, catalogs, and banners. However, the mere voluntary use of promotional materials bearing the alleged grantor's trademark is not necessarily indicative of a shared "community of interest." Cf. Kania v. Airborne Freight Corp., 300 N.W.2d 63 (Wis.1981) (voluntary promotional efforts by the alleged dealer directed at the alleged grantor's customers does not establish a dealership under the WFDL).
 
 
 20
 Financial Investment in Inventory, Facilities and Good Will
 
 
 21
 The record does not reveal how much Cajan invested in inventory. However, there is no evidence to indicate that Cajan was unable to sell its remaining stock of Winston furniture after Winston terminated their relationship.
 
 
 22
 Moreover, Cajan did not invest in any facilities that could only be used to sell Winston furniture. While Cajan did invest in the State Fair Park display by laying a brick and cobblestone patio, it is obvious that this display can still be used to sell one or more of the other outdoor furniture lines Cajan carries. Cajan's lack of investment in specialized assets militates against finding a "community of interest" under the WFDL. See Kenosha Liquor Co. v. Heublein, Inc., 895 F.2d 418 (7th Cir.1990) ("[U]nless ... the reseller has substantial assets specialized to that supplier's goods, there is no ... 'community of interest', and so no statutory 'dealership.' ").
 
 Advertising
 
 23
 Between 1986 and 1990, Cajan purchased air time from several local radio stations to run advertising "spots" featuring Winston and a competing brand of patio furniture. Cajan spent between $2,000 and $3,000 per week for approximately 16 weeks each year on this advertising. Cajan's advertising expenditures, however, were purely voluntary. The fact that an alleged dealer made voluntary promotional expenditures does not support a finding that a dealership relationship existed under the WFDL. See Kornacki v. Norton Performance Plastics, 956 F.2d 129, 133 (7th Cir.1992) (finding that no dealership existed, inter alia, because the alleged dealer was not required to incur advertising expenses).
 
 Personnel
 
 24
 Awe testified that Cajan employed between ten and fifteen people to sell patio furniture. Of that number, approximately eight salespeople also sold ski equipment and apparel. None of Cajan's salespeople were employed exclusively to sell the Winston furniture line.
 
 
 25
 Cajan's personnel practices, much like its investment in facilities, were not specialized. Cajan's salespeople were trained to sell patio furniture in general, not just the Winston line. Cajan did not "s[i]nk substantial resources into tailoring" its human resources around promoting the Winston line. Kenosha, 895 F.2d at 419. Therefore, this factor supports a finding of no "community of interest" and no statutory dealership.
 
 Supplemental Services
 
 26
 Cajan argues that it serviced Winston's customers by supplying them with additional Winston products and accessories. However, this is not the type of "supplementary services" indicative of a "dealership" arrangement. Cajan simply sold additional Winston products to existing customers, which is typical in a vendor-vendee relationship.
 
 Conclusion
 
 27
 After a thorough review of the record, we agree with the district court that there is no material factual dispute between the parties. The undisputed facts demonstrate that there was no "community of interest between Winston and Cajan sufficient to give rise to a dealership relationship." Cajan, 817 F.Supp. at 781. Thus, the WFDL does not apply and Winston was within its rights to terminate its relationship with Cajan without notice and without cause. The decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Philip G. Reinhard, District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Arnold was one of several independent sales representatives authorized to sell Winston furniture in the United States
 
 
 [2]
 These factors are generally referred to as the Ziegler factors
 
 
 [3]
 It is unclear from the record whether Cajan simultaneously operated more than one retail store in the Milwaukee area during the period of time it sold Winston furniture
 
 
 [4]
 A retail store would not be allowed to order furniture of the same frame style, fabric, and color if another retail store in the area was already selling that particular piece of furniture