DANIEL KELLY, J. (dissenting).
¶ 103 Well, this is surely curious. Today, the court manufactured and conferred on the employee members of the Employee Retirement System of Milwaukee ("ERS") a right to proportional representation on the ERS Annuity and Pension Board (the "Board"). We also manufactured and conferred on them the right to conduct at-large (as opposed to class-based) elections for their representatives. These rights don't actually exist anywhere in the constitution, statutes, regulations, or common-law, so we had to create them ex nihilo. They may be good and salutary rights for the employee members to have, but this is *619 a question not given to the judiciary to answer. We have no mandate to roam the state looking for good ideas to enact. We exhaust our commission when we pronounce the law as applied to the case before us, and we should be content with that. We were definitely not content with that role today.
¶ 104 The court found the employee members' right to elect no fewer than 3/8's of the Board's members (after accounting for the retired employees' representative added in 1972), and the right to an undivided franchise, in this distinctly pedestrian language:
The membership of the board shall consist of the following:
(a) Three members to be appointed by the chairman of the common council or other governing body (subject to the confirmation by such common council or other governing body), for a term of three years,
(b) The city comptroller ex-officio,
(c) Three employe members who shall be members of the retirement system and who shall be elected by the members of the retirement system for a term of three years according to such rules and regulations as the board shall adopt to govern such election....
§ 7(2), ch. 396, Laws of 1937 (the "1937 Law").
¶ 105 If, as the court says, the employees' rights come from this statute, we ought to be able to find them there. This presents a simple matter of statutory construction. Typically, when we set out to discover the meaning of a statute, we start with its language. See State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.' " (citation omitted) ).
¶ 106 Here, however, this method hits an immediate dead-end. The 1937 Law does not say the employees have a right to a minimum percentage of board seats. Nor does it so much as imply the employees have a right to elect their representatives at large, rather than by class. To the extent this statutory provision mentions the employees at all, it simply says the Board will contain three employee representatives, and those representatives will be elected by the employees. Our standard method of statutory construction tells us to stop here and tell the members of the Milwaukee Police Association ("MPA") and members of the Milwaukee Professional Fire Fighters Association ("MPFFA") that the rights they seek are not there.
¶ 107 But perhaps this is one of those instances in which the claimed statutory rights are not immediately apparent, and fluoresce only in the presence of the violation. The court said the City trespassed on the employees' rights when, in a 2013 city charter amendment ("2013 Amendment"), it added three mayoral appointees to the Board and established voting classes. See majority op., ¶ 4. With respect to the latter revision, the amendment provides that members of the MPA would vote for one of their own to represent them on the Board, members of the MPFFA would do the same, and the remaining employees would vote for a third representative. See Milw., Wis., Charter Ord. § 36-15-2(a-3)(c).
¶ 108 So let's compare the results of the 2013 Amendment to the provisions of the 1937 Law. Before the amendment, the employees had three representatives on the Board. After the amendment, the employees had three representatives on the Board.[1] Before the amendment, the employee *620 representatives were "elected by the members of the retirement system." See § 7(2)(c), ch. 396, Laws of 1937. After the amendment, the employee representatives were "elected by the members of the retirement system." See Milw., Wis., Charter Ord. § 36-15-2(a-3)(c). True, they were elected by classes, but each class is composed exclusively of members of the retirement system. Therefore, because no one but a member of the retirement system voted for any of the employee representatives, it is necessarily true that they were each "elected by the members of the retirement system." So the alleged violation fluoresces nothing.
¶ 109 It is, however, entirely understandable that the MPA and the MPFFA would not favor the 2013 Amendment-it reduced the employee members' influence on the board from 3/8's to 3/11's. And voting by class means the MPA and the MPFFA cannot elect more than one of their members to the Board. But the question we are to answer is not whether the 2013 Amendment is good for the MPA or MPFFA; it is whether the City had the authority to enact it.
¶ 110 The authority to alter the administration of the ERS came from a 1947 statute-the same statute, ironically, that the court says restricts the City's authority to do what it did:
For the purpose of giving to cities of the first class the largest measure of self-government with respect to pension annuity and retirement systems compatible with the constitution and general law ... [c]ities of the first class are hereby empowered to amend or alter the provisions of this act in the manner prescribed by section 66.01 of the statutes ; provided that no such amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration.
§ 31(1), ch. 441, Laws of 1947 ("1947 Law"). The legislature decided that the City is to have the "largest measure of self-government," with respect to the ERS, that is "compatible with the constitution and general law."
¶ 111 To accomplish that purpose, the 1947 Law explicitly and unambiguously authorized "[c]ities of the first class ... to amend or alter the provisions of this act," which includes the size of the board and the manner of its elections. Id. This broad delegation of authority to the City is subject only to the restriction that, as relevant here, it may not "modify the ... other rights" of the ERS's members. Consequently, unless the employee members can identify a specific right the 2013 Amendment violated, this statute unquestionably says the City may do what it did.
¶ 112 The court started its analysis on the weakest possible footing. It acknowledges, as it must, that "other rights" has no statutory definition and that there is no actual language in either the 1937 Law or the 1947 Law that creates the rights it discovers today. See majority op., ¶ 28. If we followed our standard method of statutory construction, we would have quit the field and informed the MPA and MPFFA that the rights they sought cannot be found in any applicable source of authority. But we didn't quit.
¶ 113 With no text upon which to rely, we thought to peer behind the legislative curtain in hopes of discovering what rights the legislature meant to confer, but forgot *621 to put in the act they actually adopted. So the court turned to the purpose of the 1947 Law. Majority op., ¶ 29. Assessing the purpose of a statute can be helpful in discerning its plain meaning, but we refer to the purpose to explain the text, not create substantive rights. "Statutory purpose is important in discerning the plain meaning of a statute." Westmas v. Creekside Tree Serv., Inc., 2018 WI 12, ¶ 19, 379 Wis. 2d 471, 907 N.W.2d 68 (citing Kalal, 271 Wis. 2d 633, ¶ 48, 681 N.W.2d 110 ).
¶ 114 The court fared no better questing after a legislative purpose than it did with finding textual support for its desired result. The best it could do was an observation that the " 'purpose of safeguarding the stability of pension systems' was an important concern" for the legislature. Majority op., ¶ 31 (quoting § 31(2), ch. 441, Laws of 1947). The court quoted only a sentence fragment because the sentence has nothing to do with the court's project. The sentence actually refers to the importance of a pension study committee: "For the further purpose of safeguarding the stability of pension systems in cities of the first class, the governing body shall appoint a pension study commission which shall have jurisdiction over all proposed amendments, alterations and modifications to existing pension, annuity, or retirement systems." See § 31(2), ch. 441, Laws of 1947.
¶ 115 It's anyone's guess how the importance of a pension study commission relates to proportional voting rights or at-large elections. Nonetheless, the court immediately divined from this that what the legislature was really saying is that "[s]afeguarding ERS stability is promoted by employee-participation in the Board because it is employees, current and past, for whom stability of the ERS is critical. Preamble to ch. 396, Laws of 1937." Majority op., ¶ 31. It certainly couldn't have found support for that proposition in the Preamble it cited, because the Preamble merely says, in full: "An Act relating to the establishment and administration of retirement systems in cities of the first class for the payment of benefits to the employes of such cities, and to the widows and children of such employes." Preamble to ch. 396, Laws of 1937.[2]
*622 ¶ 116 Et voilà, the sum total of the law's purpose: A declaration that a pension study commission would be important to the stability of the retirement system, and a Preamble that states the obvious. Somehow, however, the court transmuted this into the right to proportional representation on the Board and at-large elections. And it said its discovery was supported not by some vague musings, but by the legislature's clear purpose: "With that clearly stated purpose in mind, the phrase, 'other rights' easily encompasses employee voting rights because employee members of the Board are in a unique position to oversee the Board's use of funds and thereby safeguard the financial stability of the ERS." Majority op., ¶ 32. If there is hidden somewhere in there a legislatively-expressed purpose having anything at all to do with voting rights, it is quite obviously not clear. But let's be frank. It's not really there at all.
¶ 117 We are not giving voice to the legislature's purpose. We are defying it. The legislature said, in the text it actually adopted, that the City has the authority to amend the act, the very act that establishes the Board's composition and describes the elections of its members. Upon the City's exercise of its legislatively-granted authority, however, we imposed our will, our veto. Using the catch-all "other rights" provision as a window into the hidden depths of the legislature's very soul, we purportedly saw its "clear purpose" to create and preserve a right to proportional representation and at-large elections, rights so critical to the preservation of the retirement system that the legislature made no mention of them at all. What we should have seen were red flags sprouting up all around us as we privileged judicially-intuited ephemera over the text the people's representatives actually adopted.
¶ 118 If we were sitting as a legislature, the "purposes" the court attributed to the legislature might be enough to conclude we should grant the employees the voting rights they seek. But as a court, our task is different. We are trying to decide whether the legislature, in fact, did grant those rights. On that question, the court's opinion provides no analysis or information. It ticks off all the prudential reasons the employees ought to have proportionate representation and at-large elections, but it never guides its analysis back to actual legislative text. So the court offers no non-legislative justification for the court's decision.
¶ 119 Neither does the concurring opinion, which is long on general rules of statutory construction, and short-to the point of nonexistence-on sources of law for its conclusion. Its analysis rests on three propositions. The first relates to the author's fear that the City will act recklessly: "[T]he logical extension of the dissents' position would be to allow the City to disband the Employee Retirement System (ERS) Annuity and Pension Board (Board) altogether, thereby eliminating the entire administrative structure of the ERS." Concurrence, ¶ 1. The second proposition is that what the legislature provides, only the legislature may take away. Specifically, it *623 says allowing the City to change the Board's composition would ignore the "textual requirement of membership consisting of seven members-no more and no less." Id., ¶ 4. And the third is that we must give the "other rights" provision something to do to save it from surplusage. None of these propositions support the rights the court creates today.
¶ 120 The concurrence's first proposition is none of our concern. Yes, it is theoretically possible the City would eliminate the Board. But the legislature could do the same thing, and the concurrence knows it. See id., ¶ 7. Would we tell the legislature the composition of the Board is now frozen for all time because we are worried it might recklessly fiddle with it, or even dispense with it altogether? If not, where do we get the authority to say that to the City? Yes, the City may act imprudently, something cities have always had the authority to do. We have never had a shepherd's crook with which to steer governmental entities away from unwise decisions, and we should not be yearning after one.
¶ 121 Further, if the City chose to eliminate the Board, why should that be a matter of any interest to us? The concurrence says this would "leav[e] the ERS without any entity to administer or operate it." Id., ¶ 5. That presumes an awful lot. Perhaps the City would choose to replace the Board with a managerial staff. Such an arrangement would still allow the system to operate. But let's assume the City really does want to sabotage the retirement system, and that it will do so by eliminating the Board and leaving the management space entirely void. If that decision had the effect of altering or modifying the members' annuities or benefits (by, for instance, making it impossible to collect them), then we would have something to say. But only because the 1947 Law prohibits the City from altering or modifying the members' annuities or benefits. See § 31(1), ch. 441, Laws of 1947 (providing that no "amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration.").
¶ 122 So the concurrence's first proposition expresses not a legal concern, but a distrust in either the City's good faith or its ability to avoid self-destructive decisions. Either way, this is not a matter for judicial attention.
¶ 123 The concurrence's second proposition-what the legislature gives, only the legislature may take-proves far, far too much. It proves so much, in fact, that it contradicts the legislature's express grant of authority to the City. The concurrence says it sees in the 1937 Law a "textual requirement of membership [in the Board] consisting of seven members-no more and no less." Concurrence, ¶ 4. The legislature didn't say the Board would never be larger or smaller than seven members, of course. It simply specified its composition. But if the concurrence is right about the effect of legislative specifications, then the transfer of authority over the ERS to the City completely failed. Together, the 1937 Law and the 1947 Law specify all of the particulars of the ERS. So if the City cannot change the Board's composition because it was specified by the legislature, then the City may not change any part of the ERS because the entirety of the program was established through legislative specification. That, however, would mean the legislature's directive that "[c]ities of the first class are hereby empowered to amend or alter the provisions of this act," § 31(1), ch. 441, Laws of 1947, has no meaning.
¶ 124 But the legislature's directive does have meaning. It means what it so obviously *624 says-the City may change any part of the act (all of which are legislative specifications) so long as it does not alter or modify annuities, benefits, or other rights. The concurrence identified nothing about the Board's composition that made it more special than any other specification in the act. And the legislature didn't breathe so much as a word about the members having a right to a Board with an unchanging composition. Therefore, the City may change it as readily as it may change any other legislative specification in the act. And that means the concurrence's central rationale directly contradicts what the legislature actually said.
¶ 125 Beyond that, the concurrence contradicts itself on this very point. Apparently, under certain circumstances the concurrence does not identify, the City does have the authority to change the composition of the Board. Within two sentences of saying the Board must have seven members ("no more and no less"), it said the court's decision will not affect the City's decision to increase the Board to eight members:
Justice Abrahamson's dissent questions whether the court's decision in this case means that the 1972 amendment, which added the retiree position to the Board (thereby expanding its membership to eight), is also invalid. That issue is not before us, no one apparently contested the 1972 amendment, and our decision in this case has no impact on that amendment.
Concurrence, ¶ 4 n.2 (citation omitted).
¶ 126 If the legislature's specification of the Board's composition means the City may not change it, then increasing the Board's membership to eight was self-evidently beyond the City's authority. If that is not so, then why may the City add one member to the Board, but it cannot add three? Either the concurrence is wrong, or the eighth seat must be removed as well as the three added by the 2013 Amendment. The concurrence cannot have it both ways.
¶ 127 Finally, there is the third proposition-the concern that we must define the full reach and scope of the "other rights" provision. With respect to this clause, the concurrence said that "when the legislature does not define a term, it is up to the judiciary to identify and declare its meaning, something neither dissent attempts." Id., ¶ 1. The concurrence fears that, unless we find something to put in the "other rights" category, it might remain forever empty, a provision with no work to do. Our job in this case was not to delve the 1937 Law and the 1947 Law to discover all of the other rights they might confer on the ERS members (if any). The MPA and the MPFFA came to us claiming they had a right to a board of a certain size, and a franchise of a particular composition. Our job was simply to look into the 1937 Law and the 1947 Law to see if those rights were there. If we don't find them, our commission is at an end.
¶ 128 That doesn't mean the "other rights" provision has no meaning. There might be any number of rights in the 1937 Law or the 1947 Law that this provision protects. But we don't need to know that to resolve this case. We just need to know whether the petitioners' claimed rights exist in those acts. Anything more is a pointless advisory opinion.
¶ 129 Ultimately, the concurrence is just a petitio principii error, in which it assumed its conclusion as part of its argument. It expressed the error most succinctly when it said that "[w]hile the state legislature precluded the City from changing the composition of the Board, the legislature itself retains this power." Id., ¶ 7. The first part of the sentence contains the hidden assumption that the "other rights" clause can turn a legislative specification into a right. Because that assumption is *625 the sole motive force for the concurrence's entire argument, the rationale rises or falls with its vitality. But the "other rights" clause cannot accomplish what the concurrence assumes it can. It is not a source of rights, it only protects rights that already exist elsewhere. For it to have any operative effect, therefore, the concurrence must identify an already-existing right that the "other rights" clause can then protect.
¶ 130 The concurrence did not identify a right to a specific Board size, or a right to at-large elections; all it identified were legislative specifications. Consequently, it identified nothing for the "other rights" clause to protect. In fact, it admitted the rights claimed by the MPA and MPFFA do not exist (apart from the "other rights" clause) when it acknowledged the legislature can change the Board's composition without impacting any of the ERS members' rights. See id. So if the legislature can change the Board without violating a right, why can the City not do the same? Because of the "other rights" provision, the concurrence says. And that completes the petitio principii error. If the members have no right to a specific Board composition as against the legislature, but they do have such a right as against the City, it can only be because the "other rights" clause created a right out of something that was not otherwise a right. How does the clause accomplish such a feat? The concurrence did not say because it simply assumed it could, and it baked that assumption into its conclusion. Classic. We should avoid such illogic.
*
¶ 131 Perhaps there is some gnosis to which I have not been initiated that can explain what the court has done here, but I don't see it. I respectfully dissent.

The City, in fact, contends it has the right to completely eliminate the Board. Justice Kelly's dissent mischaracterizes my application of the Presumption Against Ineffectiveness principle (see Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012) ) and infra, ¶¶ 2, 3, 5, as a "fear that the City will act recklessly." Justice Kelly's dissent, ¶ 119. My judgments are based on the law, not on emotion or value judgments about parties' actions, and Justice Kelly's dissent is unable to identify any language in my concurrence to the contrary.

Justice Abrahamson's dissent questions whether the court's decision in this case means that the 1972 amendment, which added the retiree position to the Board (thereby expanding its membership to eight), is also invalid. Justice Abrahamson's dissent, ¶ 99. That issue is not before us, no one apparently contested the 1972 amendment, and our decision in this case has no impact on that amendment. Justice Kelly's dissent misunderstands this statement as a validation of the 1972 amendment adding a retiree member to the Board. Justice Kelly's dissent, ¶¶ 125-26. Again, the court does not decide whether the 1972 amendment conforms with the Session Laws; no party presented that issue to us.

Justice Kelly's dissent classifies my analysis as a "petitio principii error." Justice Kelly's dissent, ¶ 129. In plainer terms, he means it begs the question. This argument distorts my analysis of the "other rights" clause. I agree with Justice Kelly that this clause "is not a source of rights, it only protects rights that already exist elsewhere." Id. Justice Kelly and I simply disagree as to whether Board composition is a right. Justice Kelly also misrepresents my analysis by claiming that I "acknowledge the legislature can change the Board's composition without impacting any of the ERS members' rights." Id., ¶28. This concurrence says no such thing. While Board composition is a right, it is statutory, not constitutional. Accordingly, the legislature may change it, and that would certainly impact members' rights. Because Board composition is an "other right" the City may not modify it; the legislature withheld this power from the City in its otherwise broad delegation of authority to the City. This is not "illogic"; it is fundamental law. See Relyea v. Tomahawk Paper & Pulp Co., 102 Wis. 301, 304, 78 N.W. 412 (1899) ("[M]ere statutory rights may be conferred upon such conditions as in the wisdom of the legislature may seem best, and the conditions may be changed from time to time, even as to existing rights, or such rights may be taken away entirely, at the legislative will.").

Apparently because the legislature did not define the word "right" to encompass Board composition, Justice Kelly's dissent would remove Board composition from its scope. Justice Kelly's dissent, ¶ 124. Of course, the legislature did not define "right" at all. As this concurrence explains, the legislature's linguistic imprecision does not relieve us of our obligation to interpret the language the legislature did use. I agree that "[o]ur job in this case was not to delve into the [Session Laws] to discover all of the other rights they might confer on the ERS members...." Justice Kelly's dissent, ¶ 127. Our responsibility was to interpret the word "rights" and determine whether Board composition is among them. The dissents do not interpret the word but merely disagree with the majority's analysis of it.

Justice Kelly's dissent misrepresents the scope of my analysis. Justice Kelly's dissent, ¶ 123. It is not the fact that the Session Laws mandate the composition of the Board that removes the Board structure from the otherwise broad grant of authority of the City. That mandate, like any other in the Session Laws, must be read in conjunction with the pivotal language that constrains the City's ability to modify the provisions governing the ERS under the "other rights" clause. Not every "legislative specification" constitutes a "right" of ERS members that the City may not disturb.

Milwaukee Police Ass'n v. City of Milwaukee, No. 2015AP2375, unpublished slip op., 2017 WL 1096500 (Wis. Ct. App. Mar. 23, 2017).

For a discussion of cross-motions for summary judgment, see Ziegler Co., Inc. v. Rexnord, Inc., 139 Wis. 2d 593, 595 n.1, 407 N.W.2d 873 (1987).